JOSEPH R. EVERETT vs. THE 357 CORP. & another.[1]

Norfolk. December 2, 2008. - April 13, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Anti-Discrimination Law,* Handicap, Employment. *Americans with Disabilities Act. Practice, Civil,* Judgment notwithstanding verdict. *Massachusetts Commission Against Discrimination. Jurisdiction,* Administrative matter, Superior Court, Primary jurisdiction. *Administrative Law,* Primary jurisdiction.

Brief summary of the statutory scheme governing the scope of discrimination claims filed in the Superior Court pursuant to G. L. c. 151B and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. [599-602], and the limitations of a complaint filed with the Massachusetts Commission Against Discrimination on a subsequently filed civil action in Superior Court [602-603].

In an action brought in Superior Court by a plaintiff alleging that his former employer discriminated against him in violation of the Americans with Disabilities Act, the judge erred in denying the employer's motion for judgment notwithstanding the verdict, where the Superior Court lacked subject matter jurisdiction on the only claims for which the jury awarded damages to the plaintiff, given the plaintiff's failure to file a predicate complaint regarding those claims with the Massachusetts Commission Against Discrimination (MCAD) or to demonstrate that those claims were encompassed by an earlier MCAD filing, were reasonably related to that earlier filing, or were within the scope of allegations that the MCAD could reasonably be expected to uncover in investigating that earlier filing. [603-608, 611-613]

Discussion of the doctrine of primary jurisdiction and its application in an employment discrimination case involving the issue of the employee's medical qualifications, under regulations of the United States Department of Transportation, to drive commercial motor vehicles. [608-611]

CIVIL ACTION commenced in the Superior Court Department on February 11, 2000.

The case was tried before *Charles M. Grabau, J.*

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

---

[1]Trans-Lease Group. Trans-Lease Group, a holding company, provides administrative services to The 357 Corp. (collectively, the company).

*Gary M. Feldman* for the defendants.

*Jeffrey M. Feuer* (*Lee D. Goldstein* with him) for the plaintiff.

*Beverly I. Ward,* for Massachusetts Commission Against Discrimination, amicus curiae, submitted a brief.

*Nina Joan Kimball,* for Charles Hamilton Houston Institute for Race & Justice & others, amici curiae, submitted a brief.

MARSHALL, C.J. The plaintiff, Joseph R. Everett, brought suit in the Superior Court alleging that his former employer, The 357 Corp. and Trans-Lease Group (collectively, the company), discriminated against him in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq. (2000 ed.), and the Massachusetts antidiscrimination statute, G. L. c. 151B, when it did not permit him to return to work as a commercial truck driver after his discharge from a psychiatric hospital in 1996. In his complaint and pretrial pleadings, Everett asserted that he was seeking damages for wrongful actions occurring "in February 1997 and thereafter." As we describe below, on February 14, 1997, in conformity with regulations promulgated by the Federal Motor Carrier Safety Administration of the United States Department of Transportation (DOT), the company's physician declined to certify Everett as medically qualified to drive a commercial motor vehicle.[2]

At trial, Everett changed his theory of liability to cover alleged acts of discrimination occurring only in 1999, expressly and repeatedly waiving all claims of discrimination by the company before 1999.[3] The company vigorously contested the "waiver" of the earlier claims at every step. See *infra.* After the close of evidence, again over the company's vigorous objection, Everett moved to amend his complaint to conform to the evidence by asserting, among other things, a claim for damages based solely on his 1999 claims. The judge submitted both the 1996-

---

[2]See 49 C.F.R. § 391.1 (1991) (regulation promulgated by the Federal Motor Carrier Safety Administration of the United States Department of Transportation [DOT] describing rules establishing "minimum qualifications for persons who drive motor vehicles" for motor carriers, and "minimum duties of motor carriers with respect to the qualifications of their drivers").

[3]We designate Everett's allegations of discriminatory action by the company concerning events that occurred in 1996 and 1997 as the "1996-1997 claims," and allegations of discriminatory action by the company concerning events that occurred in 1999 and thereafter as the "1999 claims."

1997 claims and the 1999 claims to the jury. The jury found that the company had acted lawfully in connection with Everett's 1996-1997 termination, but had discriminated against Everett by refusing to reinstate him in 1999. They awarded Everett damages in the amount of $757,701 on the 1999 claims. The trial judge then allowed Everett's motion to amend, and subsequently awarded Everett fees and costs in the amount of $370,678.58. The company appealed, and we transferred the case here on our own motion.

Of the several grounds to vacate urged by the company, we consider only the dispositive issue whether the judge erred in permitting Everett's 1999 claims to go to the jury where, as we shall explain, he did not file a complaint with the Massachusetts Commission Against Discrimination (MCAD) related to those claims. We conclude that Everett's failure to file a predicate complaint with MCAD deprived the court of subject matter jurisdiction on the only claims for which the jury awarded Everett damages, his 1999 claims. G. L. c. 151B, §§ 5, 9. The company's motion for judgment notwithstanding the verdict on that ground should have been allowed. We set aside the jury verdict and the award of fees and costs, and remand the case to the Superior Court for the entry of a judgment of dismissal.[4]

1. *Factual background.* We recite the relevant facts as the jury could have found them and, where relevant, include additional uncontested material. See *Pardo* v. *General Hosp. Corp.*, 446 Mass. 1, 3 (2006).

a. *The events of 1996 and 1997.* This dispute has its origins in 1996. In late January or early February of 1996, Everett, who had been employed as a commercial truck driver by the company since 1986, was suspended for one month for sending an inappropriate letter to a woman coworker. Fearing that his job was in jeopardy, Everett contacted Dr. Lillian Sober-Ain, a clinical

---

[4]We acknowledge the amicus brief submitted by the Massachusetts Commission Against Discrimination (MCAD) in support of the company, and the brief submitted by the Charles Hamilton Houston Institute for Race & Justice, the Lawyers' Committee for Civil Rights Under the Law of the Boston Bar Association, Gay and Lesbian Advocates and Defenders, Greater Boston Legal Services on behalf of the Chelsea Collaborative, Jewish Alliance for Law and Social Action, Massachusetts Employment Lawyers Association, and Massachusetts Law Reform Institute in support of Everett.

psychologist, for mental health treatment. Dr. Sober-Ain diagnosed Everett as suffering from an adjustment disorder with depressed mood, and posttraumatic stress disorder with delayed onset.[5]

Everett returned to work but, as he testified at trial, when he did so, he was "very nervous," and "I thought I was being followed by different people, groups of people, whether it be the company, or that girl." Everett's mother testified that, when her son returned to work, "he started telling us" that the women who were "involved in his being suspended were following him to his work places." Everett's mother also testified that, in June, 1996, while Everett was visiting his family, she became concerned because "he was very upset and yelling about these girls," saying "they're following me again." He would "sometimes" run outside in the dark, stating that "he heard something," "thought somebody was trying to do something to his car," and said that he "heard voices." His mother testified that her son began "to seem a little paranoid."

A physician recommended by Everett's union was consulted by the family, who were told that Everett "could be a danger to himself or others and should be in the hospital." Everett's family persuaded him to receive treatment at Cape Cod Hospital, and then involuntarily committed him to Bournewood Hospital. See G. L. c. 123, § 12. Everett remained an inpatient at Bournewood Hospital for two weeks, during which time he was diagnosed with paranoid schizophrenia.[6] His treating physician at that hospital testified that Everett's condition was a "lifelong" illness. On his discharge on July 9, 1996, Everett was given prescriptions for antipsychotic medications, including Haldol and Cogentin.[7]

---

[5]At trial, Dr. Lillian Sober-Ain testified that she arrived at the diagnosis of posttraumatic stress disorder based on traumatic experiences Everett related involving a former girl friend. Everett testified that, in 1987 or 1988 when he confronted the woman about her drug use, she assaulted him with a knife, cutting a major artery. Everett was taken to a hospital, and subsequently required emergency surgery.

[6]During his involuntary commitment at Bournewood Hospital and during subsequent psychiatric evaluations, Everett denied that he had any psychological problems or needed hospitalization. At trial, Everett testified that he never believed that he had a mental disorder.

[7]Everett later reported to one of his doctors that Haldol made him drowsy. Dr. David M. Roston, a physician who evaluated Everett's fitness to drive

Following his discharge from Bournewood Hospital, Everett sought to return to work with the company. Consistent with Federal regulations governing the commercial trucking industry,[8] the company required Everett to be medically evaluated to determine whether he remained physically and mentally qualified under DOT regulations to drive heavy commercial vehicles on the public roads. Dr. David M. Roston, a psychiatrist at Atlantic Health Group, conducted the evaluation. On July 18, 1996, based on his examination, Dr. Roston refused to issue Everett a medical examination certification of fitness to drive a commercial motor vehicle (DOT certificate) at that time. Dr. Roston also recommended to the company that Everett "undergo an independent psychiatric evaluation." On September 26, 1996, at the company's request and expense, Everett was evaluated by psychiatrist Dr. Roy Lubit. Using criteria established by the DOT, 49 C.F.R. § 391.41(b)(9), Dr. Lubit concluded that "I cannot certify this individual as healthy to drive." Dr. Lubit

commercial trucks, stated in a July, 1996, letter to the company that "Haldol may cause side effects which could interfere with Mr. Everett's ability to drive a truck safely." In a subsequent September, 1996, medical report to the company, psychiatrist Dr. Roy Lubit wrote that Everett had "ceased his Haldol, which treats psychotic disorders, about a month ago [August, 1996], and he says he does not plan on going back to his psychologist or his psychiatrist. It is not clear to what extent his psychiatrist or psychotherapist are in agreement with his plans, it seems the patient is refusing treatment at this time."

[8] As the driver of a commercial motor vehicle, Everett was subject to certain regulations promulgated by the DOT pursuant to congressional authority. See 49 U.S.C. § 31102(a) (2006 ed.). The regulations prohibit motor carriers from employing as a commercial truck driver any individual who does not have a DOT certificate attesting to his physical and mental fitness to drive. See 49 C.F.R. § 391.41(a) (1996) ("A person shall not drive a commercial motor vehicle unless he/she . . . has on his/her person . . . a medical examiner's certificate that he/she is . . . qualified to drive a commercial motor vehicle").

Examining physicians were, and are, required to follow a set protocol in determining whether to issue the DOT medical certification. See 49 C.F.R. § 391.43 (1996). To obtain a DOT certificate, DOT regulations explicitly state that a driver have "no mental . . . disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely." 49 C.F.R. § 391.41(b)(9) (1996). See F.F. v. Laredo, 912 F. Supp. 248, 254 (S.D. Tex. 1995); Daugherty v. El Paso, 56 F.3d 695, 698 (5th Cir. 1995) ("Woe unto the employer who put such an employee behind the wheel of a vehicle owned by the employer which was involved in a vehicular accident"). Since 2000, the regulations have expressly provided that "[h]istory of certain conditions may be cause for rejection." See 49 C.F.R. § 391.43 (2008).

stated that he had "discussed this issue with Dr. Roston who agrees."

Everett then sought an examination by a doctor of his own choosing, Dr. James R. Bieber. On January 25, 1997, Dr. Bieber evaluated Everett to determine whether "he is able to return to his job of driving a truck while on medication." Dr. Bieber concluded that Everett "is able to return to the work of driving a truck," noting, however, that Everett should be "carefully" monitored, and that either emotional or physical stress "could lead to another decompensation." Dr. Bieber's report made no reference to DOT qualification requirements.

Dr. Roston reviewed Dr. Bieber's report and the mental health qualification requirement of 49 C.F.R. § 391.41, and on February 14, 1997, reported to the company that, although Everett was responding well to his medications, "he has the risk of future psychotic episodes which could interfere with his ability to safely operate a truck." In light of the requirements of the DOT regulations, he again declined to issue the DOT certificate. The company refused to permit Everett to return to work.

In February, 1997, Everett, through his union, filed a grievance seeking reinstatement. In connection with the grievance, Everett and the company sought a mutually agreed-upon third-party medical evaluation of Everett by an expert, whom Everett's business agent termed at trial "a neutral third party." The parties agreed to have Dr. Lubit serve in that role. In a June 26, 1997, report that again cited DOT regulations, Dr. Lubit concluded: "I cannot state that [Everett's] psychiatric problems will not be a problem. They are a continual risk to his driving and I would be unable to qualify him."

DOT regulations require drivers who wish to overturn adverse medical evaluations to appeal from the decision to the DOT.[9] While the administrative appeal is pending, the driver is deemed

---

[9] See 49 C.F.R. § 391.47, entitled "Resolution of conflicts of medical evaluation," which provides, in relevant part, that when a driver desires review of a motor carrier's conclusion that he is medically unqualified, the driver "must submit [to DOT] proof that there is a disagreement between the physician for the driver and the physician for the motor carrier concerning the driver's qualifications," along with, among other things, "a statement of his agreement to submit the matter to an impartial medical specialist in the field [in which the medical conflict arose]" whose selection is "agreed to by the

not medically qualified to operate commercial motor vehicles. 49 C.F.R. § 391.47(f) (where driver and motor carrier disagree about medical certification, "the driver *shall be deemed disquali-fied* until such time as the [DOT] makes a determination" [emphasis added]). See *Carolina Freight Carriers* v. *Pennsylva-nia Human Relations Comm'n,* 99 Pa. Commw. 428, 436 (1986) ("where there is a conflict in the medical evidence a driver will remain *unqualified* until the federal government decides to the contrary" [emphasis in original]). Everett did not file an appeal with the DOT at any time to review the adverse conclusion of the mutually agreed-upon medical specialist, Dr. Lubit. He did, however, through his union, file a request to arbitrate his grievance. The arbitration panel dismissed Everett's claim.

On July 3, 1997, one week after Dr. Lubit had declined a second time to certify Everett as medically qualified to drive a commercial motor vehicle, Everett filed a charge of discrimina-tion with the MCAD, which also was filed with the Equal Employ-ment Opportunity Commission (EEOC).[10] He asserted, among other things, that in June, 1996, he "went on a medical leave of

motor carrier and the driver," 49 C.F.R. § 391.47(b)(2), (3); "a statement explaining in detail why the decision of the medical specialist . . . is unac-ceptable," 49 C.F.R. § 391.47(b)(4); and "all medical records and statements of the physicians who have given opinions on the driver's qualifications." 49 C.F.R. § 391.47(b)(7). DOT may then either "request further information," 49 C.F.R. § 391.47(c), or "notify the parties that the [appeal] has been ac-cepted and that a determination will be made." 49 C.F.R. § 391.47(d)(1). If the driver disagrees with the DOT's determination, he is entitled to judicial review in the United States Court of Appeals, 49 C.F.R. § 386.67 (2008), which has "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all . . . final orders of . . . the Secretary of Transportation." 28 U.S.C. § 2342(3) (2006 ed.). No State may "establish[]" or enforce any law that would prevent "full compliance" with DOT regulations. 49 C.F.R. § 390.9 (2008). Accordingly, DOT's authority to resolve conflicts concerning DOT certification (subject to Federal judicial review) is exclusive.

[10]Equal Employment Opportunity Commission (EEOC) regulations desig-nate the MCAD as a fair employment practice (FEP) agency. See 29 C.F.R. § 1601.74(a) (2008). "EEOC policy is to defer to FEP agencies for a limited period of time to allow those agencies to resolve problems at a local level. . . . A charge filed with the MCAD automatically becomes filed with the EEOC 60 days after its filing, or earlier if the MCAD terminates its investigation. See 29 C.F.R. § 1601.13(a)(4). A charge filed with the EEOC in a jurisdiction having a designated FEP agency, as Massachusetts does, is automatically referred to that state agency." *Davis* v. *Lucent Techs., Inc.,* 251 F.3d 227, 230 n.1 (1st Cir. 2001).

absence," that he was "well enough to return to work in July, 1996 but [the company] refused to allow me to return," and that the company "has refused to return me to work because of my perceived disability, even though I am capable of performing the essential elements of my driver's position." On December 11, 1998, after an investigation, see 804 Code Mass. Regs. § 1.13(7) (1993); G. L. c. 151B, § 5, the MCAD issued a Lack of Probable Cause (LOPC) determination, and closed its investigation.

At some point — no appeal date is indicated in the record — Everett administratively appealed from the LOPC determination; a hearing on his appeal was held on February 9, 1999. 804 Code Mass. Regs. § 1.15(7)(d) (1999). On May 4, 1999, the investigating commissioner affirmed the LOPC determination "[b]ased upon information presented at the appeal hearing and a review of the evidence adduced in investigation . . . ."

b. *The events of 1999.* In the meantime, and notwithstanding that both Dr. Roston and Dr. Lubit had refused to certify him as medically qualified in conformity with DOT regulations to drive commercial motor vehicles, Everett drove heavy commercial trucks for other employers. To obtain these jobs, beginning in 1997, Everett acquired at least five DOT certificates from various physicians. At trial Everett testified that he did not disclose to any of the certifying physicians his previous psychiatric history either during any medical examinations or on the forms required for each examination. To the contrary, when asked directly, he informed each examining physician that he had "no" history of a psychiatric disorder.[11] See note 8, *supra.*[12]

Before January 12, 1999, the company had no knowledge

___

[11]In contrast, in July, 1996, following his discharge from Bournewood Hospital, Everett had indicated on the medical examination form he gave to Dr. Roston that he had a "history" of "psychiatric disorder."

Since 2000, DOT medical history forms have required drivers to affirm the following: "I certify that the above information is complete and true. I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate." 49 C.F.R. § 391.43, at 339 (2008). See 65 Fed. Reg. 59,363 (Oct. 5, 2000) (promulgating new version of medical examination form because the form in effect "has remained unchanged since it was adopted by the DOT in 1970"). The medical history forms completed by Everett did not contain certification language.

[12]Everett testified that he did not disclose a history of psychiatric disorder when seeking the post-1996 DOT medical certificates because "I never believed

that Everett had acquired these DOT certificates and was driving commercial vehicles for other employers. On that date Everett initiated a second union grievance against the company, in which he sought "[t]o be put back to work as a driver" with "his seniority and lost wages and benefits since January 12, 1999."[13] He asserted, through a union representative, that he had "new" evidence to support his request. The "new" evidence included, among other things, a personal affidavit, a driver's road test, a seniority list from the company dated September 9, 1998, that included his name, Dr. Bieber's evaluation of January 25, 1997, a letter from one employer stating that he had been qualified to serve as a "lead driver," a physical examination form from another employer, several DOT certificates obtained since 1997, and an affidavit from a union doctor attesting that "it appears that Joe Everett is in remission" from his emotional problems and his "case appears to be one in which any disabilities he incurred are now resolved and he has returned to normal baseline functioning" sufficient to "resume" his duties with the company.

The company raised as a "point of order" to the 1999 grievance that the issue of Everett's medical qualification had been definitively resolved in the 1997 grievance, and that, based on the 1997 conclusions of Dr. Lubit and Dr. Roston, as upheld in the 1997 grievance proceeding, Everett was not DOT-certified to drive a commercial motor vehicle. The 1999 arbitration panel dismissed Everett's grievance. See *EEOC* v. *Allied Sys., Inc.,* 36

I had a mental illness" and because "I knew had I put down yes . . . 90 percent of the road jobs wouldn't hire me. They'd discriminate against me for that reason." In closing arguments, his counsel pressed the point: "Now, it's certainly true that in applying for those jobs, [Everett] marked down on the medical forms that he did not have a history of mental illness or psychiatric disorders. He told you he did that. He wasn't hiding anything. He told you why he did that. First and foremost he told you that he didn't want to be discriminated against because of his past, the same way that he felt [the company] was discriminating against him."

[13]The grievance stated, among other things, that Everett "has been employed driving over the road — cross country trips for other employers since January 1997. Driving larger equipment and handling more responsibility than he had at the [company]. He also has current D.O.T. physical cards in his possession that he has provided to his employers. The [company] said they need a D.O.T. card from Dr. Roston (their company doctor). [Everett] feels . . . he will never get a card from Dr. Roston."

F. Supp. 2d 515, 522 (N.D.N.Y. 1999), quoting *Campbell* v. *Federal Express Corp.*, 918 F. Supp. 912, 918 (D. Md. 1996) (motor carrier "not required to accept the determination of . . . a physician for one of [the motor carrier's] competitors. 'As a matter of law, [the motor carrier] was not bound to accede to determinations made by medical professionals retained by its competitors; [the motor carrier] was entitled to rely on the determinations made by its medical professionals' ").

2. *Procedural background.* We recount the procedural background in some detail, as befits the jurisdictional issue in this case. On February 11, 2000, approximately thirteen months after filing his second grievance and almost three years to the day from Dr. Roston's final rejection of Everett's DOT qualifications on February 14, 1997, Everett filed a complaint in the Superior Court. See G. L. c. 151B, § 9 (establishing three-year statute of limitations for filing discrimination claims pursuant to G. L. c. 151B). The allegations of the complaint are ambiguous. Everett specifically referenced discrimination by the company "[s]ince February 14, 1997," the date of Dr. Roston's letter reviewing and rejecting Dr. Bieber's opinion that Everett was medically certified to drive commercial trucks; it also referred to the MCAD's LOPC determination of December 11, 1998. The complaint alleged that the company "failed and refused to re-employ Everett" or to offer him reasonable accommodation "even in the face of Mr. Everett's exemplary truck driving record with other companies" since February 14, 1997. The Superior Court complaint did not allege that any act of discrimination had occurred in 1999, did not allege that in 1999 Everett had presented the company with "new" evidence about his mental health, and did not allege that the company had failed to rehire Everett in 1999 in the face of such "new" evidence or otherwise.[14] The complaint included a generally worded request for damages as a "result of [the company's] discriminatory actions." Fairly read, the complaint alleged that Everett had not been returned to work by the company on February 14, 1997, that his complaints of discrimination had been investigated by the MCAD

---

[14]A business agent for the union which represented Everett in his 1997 and 1999 grievances testified that the "new" evidence Everett claims supports his 1999 claims had not been submitted to the company before 1999.

and their basis found lacking in probable cause, and that Everett nevertheless had suffered damages for the alleged wrongs encompassed within the MCAD investigation that had ended in 1998. There was no allegation that the company did or did not do anything on January 12, 1999, or thereafter.

On July 31, 2000, the company moved to dismiss the complaint for failing to comply with the applicable statute of limitations, which period, the company argued, commenced in July, 1996, when Everett sought to return to work after his hospitalization. Everett opposed the motion. He argued that, while "it was not clear in July 1996 that [the company's] refusal to allow Mr. Everett to return to work stemmed from a discriminatory animus," such animus was evident by February 14, 1997, when the company's refusal to reemploy him was based on a discriminatory perception that he was still mentally disabled. Thus, Everett continued, he had properly alleged a continuing violation, that "save[d]" what might otherwise have been the time-barred 1996 event. See *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 531-532 (2001); 804 Code Mass. Regs. § 1.10(2) (1999) (describing continuing violation doctrine). Neither party mentioned any events in 1999, either in their memoranda or in their reply memoranda; the entire focus of the motion was whether the 1997 event anchored the 1996 event and brought it within the statute of limitations by way of the continuing violation doctrine. The company's motion to dismiss was denied.

After lengthy and acrimonious discovery disputes not material to our decision, in April, 2005, the case proceeded to trial. In the October, 2004, joint pretrial statement of expected evidence, Everett asserted that his theory of liability was that the company's "continuing" refusal to allow him to return to work due to an "unjustified" perception that he still had a disability in "February, 1997 and thereafter" constituted discrimination in violation of the Massachusetts and Federal antidiscrimination statutes. At the commencement of, and continuing throughout, the trial, however, Everett took the position that the *only* issue for resolution by the jury involved events that had occurred in January, 1999.[15] His theory of liability now rested on the fact that in January, 1999, he had submitted to the company (in connection his with

[15]Everett also argued at trial that he had not been terminated from his posi-

his second grievance) new evidence that he had been working safely as a DOT certified commercial truck driver for other companies since 1997, and that the company refused for discriminatory reasons to recognize his qualifications and to rehire him at that time. The company vigorously contested Everett's attempts to limit the evidence to events occurring in 1999. The company argued, in the main, that the 1999 claims were unrelated to the 1996-1997 events that formed the basis of Everett's MCAD complaint, and that, because Everett had not filed a MCAD complaint related to any 1999 action of the company, the 1999 claims should be dismissed. The judge denied Everett's attempts to limit the evidence to events beginning in January, 1999.

During the trial, the parties submitted proposed jury verdict forms. Everett's proposed jury verdict form focused exclusively on questions from January, 1999, and going forward. In contrast, the company's proposed jury verdict form focused exclusively on the company's refusal to reinstate Everett in July, 1996. The judge's proposed solution was to "compromise" to "reflect[ ] the different views," which he found essentially irreconcilable. His proposed jury verdict form included as a separate question the allegations of discrimination that occurred in July, 1996, and as a separate question the allegations of discrimination that occurred on January 12, 1999. The company objected to the judge's proposed verdict form "because January 12, 1999 was never pled in the complaint" and did not appear in "the [MCAD] charge of discrimination," and that "[w]e only heard about 1999 two weeks ago when this trial began." Everett in turn objected to the judge's "compromise" on the grounds that the questions would be confusing because "[w]e're not making any claims for any damages that have occurred prior to January 12, [1999]," and "you are placing a burden on the plaintiff to produce evidence . . . about claims that the plaintiff is not making." The judge refused to modify his proposed verdict form.[16]

tion at the company but that he had been on a leave of absence from the company from which he was wrongly prevented from returning, a theory we discuss *infra*.

[16]The judge told Everett's counsel, "You want to negate everything the employer did in [1996], and you want to start the whole thing over in [1999]. That's not — those aren't the facts in this case."

Everett's final, and most direct, attempt to refocus the trial on his claim that liability rested solely on events that occurred in January, 1999, took place the day the jury began their deliberations. That morning, Everett submitted a motion to amend the complaint to conform to the evidence. In his motion, Everett "waived *all* claims for damages *prior* to [January 12, 1999]" (emphasis added). In his proposed amended complaint he claimed damages only for the "[company's] discriminatory actions *on and after* January 12, 1999" (emphasis added). Everett's counsel conceded that the move was a tactical one. He told the judge, "We don't have to make an argument for something we feel we may have difficulty proving. . . . Now, they don't like our theory of the case, and they don't like the fact that we've switched." The company's counsel vigorously objected to the motion and stated that the company would press its argument that the 1999 claims were not before the MCAD in a motion for judgment notwithstanding the verdict. The judge reserved decision on Everett's motion to amend the complaint, and sent the case to the jury. In his closing argument, Everett's counsel made clear to the jury that "Mr. Everett is not making any claims whatsoever for any damages for events that occurred before January 12, 1999."

The verdict form ultimately submitted to the jury required the jury to determine separately whether the company discriminated against Everett from "July 1996 to January 1999," and separately whether the company discriminated against Everett in "January 1999."[17] As to the 1996-1997 claims, the jury found that the company "terminate[d]" Everett in 1996 "due to a reasonable probability of substantial harm to the employee or others"

---

[17]The verdict form presented the following questions:

"1. Do you find that Mr. Everett proved by a preponderance of the evidence that [the company] terminated [Everett] or failed to rehire him as a commercial truck driver at any time from July 1996 to January 1999, because they regarded him as a disabled or handicapped person who was not qualified to drive a commercial motor vehicle because of that disability or handicap?" The jury answered, "Yes."

"2. Do you find that Mr. Everett proved by a preponderance of the evidence that when he applied to be rehired by [the company] in January 1999, he was qualified to be a commercial truck driver?" The jury answered, "Yes."

"3A. Do you find that [the company] proved by the preponderance of the evidence that their decision *to terminate* Mr. Everett in July 1996 was due to a

(question 3A), i.e., the termination was lawful. They found that Everett was "qualified to be a commercial truck driver" in 1999 (question 2), and that the company's "failure to rehire" him in 1999 was not for valid reasons (question 3B). The jury awarded Everett $757,701 for lost wages, insurance costs, and lost pension for the company's failure to allow him to return to work as a truck driver "as of January 12, 1999" (question 4). Stated differently, the jury found the company liable for its "failure to rehire" Everett "as of January 12, 1999" only, and awarded damages to Everett on that basis alone. After the jury returned their verdict, the judge allowed Everett's motion to amend the complaint, to which the company again objected.

The following day, the company made good on its promise to move for judgment notwithstanding the verdict or for a new trial.[18] As one of the grounds for its motion, the company asserted that Everett could not pursue claims in the Superior Court based on events occurring in 1999 because Everett had neither filed a separate complaint with the MCAD pertaining to any 1999 conduct nor amended his earlier MCAD complaint to include allegations pertaining to 1999 events.[19] On June 1, 2005, the judge denied the company's motion. He subsequently allowed

reasonable probability of substantial harm to the employee or others?" (Emphasis added.) The jury answered, "Yes."

"3B. Do you find that [the company] proved by the preponderance of the evidence that their failure to rehire Mr. Everett in January 1999 was due to a reasonable belief that he posed a significant risk of substantial harm to the health and safety of himself and others." The jury answered, "No."

"4. How much money would compensate Mr. Everett for his loss in wages, health insurance costs and lost pension resulting from the refusal of [the company] to allow [Everett] to return to work as a truck driver as of January 12, 1999?" The jury answered, "$757,701."

[18]At the close of Everett's evidence, the company had moved for a directed verdict, which was denied. At the close of all of the evidence, The 357 Corp. had renewed its motion for a directed verdict, which was again denied.

[19]The company's motion for judgment notwithstanding the verdict asserted, in part, that "[t]he court erred in allowing the plaintiff to introduce a claim sounding in discrimination relating to purported conduct occurring in 1999, without having first filed the action before the MCAD, and that "[s]ince such a filing is a prerequisite to any such 1999 allegations, any trial reference to the same as either a point of fact or as a basis for the [p]laintiff's damages is incorrect."

The company had not included this ground in its motion for a directed verdict. See note 18, *supra*. It likely could not have done so because the judge

Everett's motions for fees and costs in an amount of $370,678.58 and for entry of final judgment.

Against this factual and procedural background, we proceed to the issues for decision.

3. *Discussion.* The denial of a motion for judgment notwithstanding the verdict presents questions of law that we review under the same standard used by the trial judge. This requires us to construe the evidence in its light most favorable to the nonmoving party, here Everett, and to disregard that favorable to the moving party, here the company. *O'Brien* v. *Pearson*, 449 Mass. 377, 383 (2007), and cases cited.

a. *Statutory scheme.* We begin with a brief summary of the statutory scheme governing the scope of discrimination claims filed in the Superior Court pursuant to G. L. c. 151B and the ADA.[20]

The MCAD has been charged by the Legislature with addressing certain types of discrimination in the Commonwealth, including handicap discrimination. See *Lynn Teachers Union, Local 1037* v. *Massachusetts Comm'n Against Discrimination*, 406 Mass. 515, 523 (1990). See also 42 U.S.C. § 2000e-5 (same for EEOC). To effectuate the statute's broad remedial purpose, G. L. c. 151B provides that, before a complaint may be filed in the Superior Court, a plaintiff must first file with the MCAD "a verified complaint in writing," which shall "set forth the particulars thereof and contain such other information as may

had not at the time ruled on Everett's motion to amend the complaint. In any event, in his opposition to the company's motion for judgment notwithstanding the verdict, Everett made no argument that the company had waived the point. "The general rule is that 'no grounds for the motion for judgment notwithstanding the verdict may be raised which are not asserted in the directed verdict motion.' . . . However, if the nonmoving party fails to object to the consideration of new grounds in deciding whether to grant the motion, then the nonmoving party is said to have waived the right to object on appeal." *Fox* v. *F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 583 (1996), quoting *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. 31, 34 (1991), *S.C.*, 412 Mass. 612 (1992).

[20]See *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 451 n.6 (2002) ("We look to the Federal cases decided under the ADA as a guide to the interpretation of G. L. c. 151B"); *Tobin* v. *Liberty Mut. Ins. Co.*, 553 F.3d 121, 126 n.3 (1st Cir. 2009), quoting *Gillen* v. *Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 20 n.5 (1st Cir. 2005) ("Chapter 151B 'tracks the ADA in virtually all respects' ").

be required by the commission." G. L. c. 151B, § 5. See G. L. c. 151, § 9; 42 U.S.C. § 2000e-5(e) (same for ADA claims). The purpose of the administrative filing is "(1) to provide the MCAD with an opportunity to investigate and conciliate the claim of discrimination; and (2) to provide notice to the defendant of potential liability." *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 (2001). See *Galambos* v. *Fairbanks Scales*, 144 F. Supp. 2d 1112, 1124-1125 (E.D. Mo. 2000) (to exhaust administrative remedies entitling claimant to bring action under ADA, claimant must give notice of claims of discrimination in administrative complaint).

The predicate of administrative filing is mandatory to filing a civil suit. It may not be waived.[21] Without the predicate filing in MCAD, the Superior Court has no jurisdiction to entertain the claim of discrimination. See *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 n.11 (2001) ("A claim cannot be brought alleging discrimination under G. L. c. 151B, unless it is preceded by the filing of a complaint of unlawful discrimination with the MCAD within six months of the alleged act or acts of discrimination"); *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 585 (1994) (Legislature intended "to subject all discrimination claims [under G. L. c. 151B] to some administrative scrutiny"); *Fant* v. *New England Power Serv. Co.*, 239 F.3d 8, 11 (1st Cir. 2001) ("A party who wants to file a civil action

---

[21]Failure to file a timely charge is subject to waiver, estoppel, and equitable tolling. See *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 113 (2002); *Christo* v. *Edward G. Boyle Ins. Agency, Inc.*, 402 Mass. 815, 817 (1988). Where the issue is the absolute failure to file a charge, the defect precludes a court from exercising jurisdiction over any subsequent lawsuit alleging discrimination under G. L. c. 151B or the Americans with Disabilities Act (ADA). See *National R.R. Passenger Corp.* v. *Morgan, supra*; *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 n.11 (2001). Everett presses no estoppel or equitable tolling argument that would excuse his failure to file a charge regarding his 1999 allegations. His waiver argument is not persuasive because it is not supported by the record. See note 19, *supra*.

Similarly unconvincing is Everett's argument that filing a complaint in the MCAD for the 1999 events would have been futile. Everett contends that because the company would never rehire Everett in any circumstances due to its belief that he was mentally unstable, resort to the MCAD would merely increase costs, and delay the inevitable court proceedings. We will not speculate on how the MCAD investigation might have proceeded in the face of Everett's filing charges based on events occurring in 1999, or the company's response to such an investigation had it been initiated. See note 24, *infra*.

charging discrimination in employment under Chapter 151B must first file the charge with the MCAD"). See also *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 557-558 (1996) (procedural requirements of G. L. c. 151B may not be evaded by attempting to recast c. 151B claims under other statutory provisions; court will not create new common-law remedies to evade c. 151B procedural requirements). Cf. *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 110 (2002) (pursuant to 42 U.S.C. § 2000e-5, party must file a charge "or lose the ability to recover for it").

The mandatory administrative filing does not require a plaintiff to await a determination by the MCAD prior to filing a civil suit. General Laws c. 151B, § 9, permits a plaintiff to remove the case to the Superior Court on "the expiration of ninety days after the filing of a complaint with the [MCAD], or sooner if a commissioner assents in writing." This requirement permits the MCAD to determine whether the public interest in enforcing antidiscrimination laws would be served by bringing a civil administrative proceeding under G. L. c. 151B, § 5. See *Cuddyer* v. *Stop & Shop Supermarket Co.*, *supra* at 531; *EEOC* v. *Waffle House, Inc.*, 534 U.S. 279, 292 (2002) (same for EEOC).

Where, as here, an MCAD investigation is completed, the plaintiff's administrative complaint establishes the nature of the specific charges of discrimination and the alleged factual underpinnings of those charges. The complainant may bring additional charges within the scope of the investigation by amending his MCAD complaint to "allege[] additional acts constituting unlawful discriminatory practices related to or arising out of the subject matter of the original complaint." 804 Code Mass. Regs. § 1.03(5) (1993).[22] Such amendments are made by "leave of the Commissioner," and "relate back to the original filing date." *Id.*[23] See *Ianetta* v. *Putnam Invs. Inc.*, 142 F. Supp. 2d 131, 134-135 (D. Mass. 2001) (new claims raised in plaintiff's rebuttal

---

[22]The Legislature has authorized MCAD to "adopt, promulgate, amend, and rescind rules and regulations suitable to carry out the provisions of" G. L. c. 151B. See G. L. c. 151B, § 3 (5). Unless otherwise noted, the regulations in effect at the time relevant to Everett's claims are identical to the current regulations. 804 Code Mass. Regs. § 1.03(5) (1993) was recodified as 804 Code Mass. Regs. § 1.10(6) (1999), and is unchanged.

[23]In 1999 and thereafter, such amendments were permitted to be made by

filed with MCAD are properly within scope of MCAD complaint). The administrative investigation, as originally set or as expanded during its course, then forms the factual platform for the finding of probable cause or lack of probable cause. 804 Code Mass. Regs. § 1.15(7)(a)(b) (2008). Cf. *Lattimore* v. *Polaroid Corp.*, 99 F.3d 456, 464-465 (1st Cir. 1996) ("An [administrative] investigation is a systematic inquiry into a particular matter. . . . [T]he direction and scope of the investigation are guided by the allegations contained in the charge").

Once a LOPC determination issues, the administrative investigation is closed. See 804 Code Mass. Regs. § 1.13(7) (1993), currently codified at 804 Code Mass. Regs. § 1.15(7) (2008). An investigation that concludes with a finding of lack of probable cause may be appealed administratively at a preliminary hearing presided over by the commissioner who investigated the underlying complaint (or designee). *Id.* At the preliminary hearing on appeal, the complainant is permitted to "present orally or in writing reasons why the Lack of Probable Cause determination is in error and to present such evidence in support of their argument as the Investigating Commissioner or . . . designee deems appropriate." *Id.*

b. *Scope of the Superior Court action.* In general, the MCAD complaint establishes the claims and factual allegations for the subsequent filing in Superior Court. "This generally means that a plaintiff cannot add additional claims . . . that are outside the scope of the MCAD charge . . . ." S.C. Moriearty, J.F. Adkins, L.F. Rubin & D.J. Jackson, Employment Law § 8.57, at 563-564 (2d ed. 2003). The purposes of G. L. c. 151B "would be frustrated if the claimant were permitted to allege one thing in the MCAD complaint only to allege something entirely different in the ensuing civil action." *Windross* v. *Village Automotive Group, Inc.*, 71 Mass. App. Ct. 861, 864 (2008). See *Fantini* v. *Salem State College*, 557 F.3d 22, 26-27 (1st Cir. 2009) (for cases filed with EEOC, "the scope of the civil complaint" limited "to the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge").

The general rule, however, does not mean that the administra-

---

"Order of the Commissioner." 804 Code Mass. Regs. § 1.10(6) (1999).

tive complaint sets a rigid "blueprint" for the civil action. See *Powers* v. *Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir. 1990). Under what is often termed the "scope of the investigation" rule, "a claim that is not explicitly stated in the administrative complaint may be asserted in the subsequent Superior Court action so long as it is based on the acts of discrimination that the MCAD investigation could reasonably be expected to uncover." *Windross* v. *Village Automotive Group, Inc.*, supra at 864-865. See *Powers* v. *Grinnell Corp.*, supra at 39, quoting *Sanchez* v. *Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970) ("the critical question is whether the claims set forth in the civil complaint come within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination' "). Retaliation claims typically fall within the scope of investigation rule. See, e.g., *Clifton* v. *Massachusetts Bay Transp. Auth.*, 445 Mass. 611, 618 (2005) (retaliation for filing complaint with MCAD "subsumed within the original charge"). See also *Clockedile* v. *New Hampshire Dep't of Corrections*, 245 F.3d 1, 5-6 (1st Cir. 2001) (retaliation claims preserved so long as retaliation "reasonably related to and grows out of" discrimination complained of to agency, e.g., "retaliation is for filing the agency complaint itself").

Our general overview now brings us to the merits.

c. *The 1999 claims*. On appeal, Everett invokes the scope of the investigation rule, asserting that his 1999 claims were "encompassed" by the MCAD filing, "reasonably related" to his 1997 MCAD complaint, and within the scope of claims that the MCAD "could reasonably be expected to uncover." We are not persuaded.

As a preliminary matter, we reject Everett's argument that the 1996-1997 claims were "pending" at the MCAD when the company refused to employ him in January, 1999.[24] The LOPC determination issued, and thus the investigation was completed,

---

[24] To the extent that Everett attempts to invoke the "continuing violation doctrine" to rescue the 1999 claims from dismissal, he does so to no avail. The continuing violation doctrine, as described at 804 Code Mass. Regs. § 1.10(2) (1999), generally permits a plaintiff to seek recovery on earlier discriminatory conduct where a later and timely filed charge arises from, or is sufficiently related to, a previous, but otherwise untimely, discriminatory act. See *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 531-532

in December 1998. Everett contends that his 1999 claims were in fact raised in the preliminary appeal from the LOPC determination, which was held before the MCAD investigating commissioner on February 9, 1999, approximately one month after the date of Everett's second union grievance filed on January 12, 1999. He has not, however, cited to any authority for the proposition that the MCAD preliminary appeals process permits the introduction of new allegations based on new facts not encompassed in the already completed administrative investigation being appealed.[25] It is a "stretch" to describe acts that occurred after the agency's investigation has ended as " 'within' the scope of the agency investigation." *Clockedile* v. *New Hampshire Dep't of Corrections, supra* at 5. Moreover, although the record contains a copy of the complaint filed with the MCAD, which was marked for identification but not introduced in evidence at trial, the record on appeal contains no evidence that Everett's 1999 grievance was part of the "information presented" at the preliminary appeal from the LOPC determination. The MCAD investigation closed on December 11, 1998, and the record reveals nothing that suggests that Everett sought to reopen the evidence, to amend his complaint, or to ask that "new" facts be investigated, considered with, or encompassed within the 1996-1997 claims.[26,27] The 1999 claims manifestly were not "pending" when the MCAD investigation closed.

---

(2001) ("Both this court and the Appeals Court have relied on the continuing violation doctrine to permit plaintiffs to seek damages, if the alleged events are part of an ongoing pattern of discrimination, and there is a discrete violation within the six-month limitations period to anchor the earlier claims"); *Taylor* v. *Freetown*, 479 F. Supp. 2d 227, 235 (D. Mass. 2007) ("To prevail on a continuing violation theory, Plaintiff must reach back and establish a 'substantial relationship' between the timely and untimely acts in order to recover for those prior acts"). As we will explain in more detail *infra*, "a prior act of alleged discrimination cannot be transformed into a continuing violation by the mere fact of a refusal to rehire." *DeFazio* v. *Delta Air Lines, Inc.*, 849 F. Supp. 98, 102 (D. Mass. 1994).

[25]Everett's position on the issue is contrary to that of the MCAD, as amicus, in this case. See note 4, *supra*. Cf. *DiLiddo* v. *Oxford St. Realty, Inc.*, 450 Mass. 66, 76 n.17 (2007) (as agency charged with enforcing G. L. c. 151B, MCAD's "reading of the statute is entitled to deference").

[26]At oral argument, Everett's counsel argued that, "if you look at the scope of investigation of the MCAD, they considered information that came up in 1999, specifically the information that was given to the company at the grievance hearing in 1999," adding that the 1999 grievance and the certificates

Nor can the 1999 claims fairly be said to be "reasonably related" to the 1996-1997 claims or within the scope of the allegations the MCAD complaint could reasonably be expected to uncover.[28] Fatal to this argument, in the first instance, is Everett's extraordinary and often repeated concession during the trial that the company did not actionably discriminate against him in 1996 or 1997. This strategic choice on Everett's part effectively severed the connection between the 1996-1997 claims, which were the subject of the MCAD complaint, and the 1999 claims, which were not. If there was no discrimination in 1996-1997, then there was no discrimination to "relate back" to, or to come "within the scope of" in 1999. Because no discriminatory nexus connected the 1996-1997 and the 1999 events, the 1999 events became the only events that Everett alleged to be discriminatory; they were free-standing. Everett's civil suit on the 1999 claims was accordingly not preceded by a predicate MCAD complaint, and the case fails for want of jurisdiction. G. L. c. 151B, § 9. See *Ingram* v. *Brink's, Inc.*, 414 F.3d 222, 229-230 (1st Cir. 2005) (under G. L. c. 151B, without an adverse discriminatory decision within the limitations period, "discrimination inquiry simply stops").

Everett nonetheless invokes the scope of investigation rule, which applies, he argues, because his case is not about termination. Rather, he states, it turns on the company's discriminatory refusal to return him to work from a medical leave of absence, beginning in 1996-1997 (as alleged in the MCAD complaint) and continuing through and after January, 1999. The most obvious answer to this argument is that the jury found that Everett was "terminated" in 1996. See note 17, *supra.* On appeal Everett has not objected to the judge's terminology. In any event, given the

---

"were all in front of the MCAD." Counsel acknowledged, however, that there was no information in the record pertaining to this point. It is counsel's obligation to include in the record appendix any document on which he relies: "When a party fails to include a document in the record appendix, an appellate court is not required to look beyond that appendix to consider the missing document." *Chokel* v. *Genzyme Corp.*, 449 Mass. 272, 279 (2007).

[27]In a postargument letter filed by the MCAD, it stated that the records from the preliminary appeal had long since been destroyed in accordance with the Secretary of the Commonwealth's record retention policy.

[28]Everett does not claim that the refusal to employ him in 1999 was in retaliation for his filing an MCAD complaint in 1997.

absence of any evidence in the record that Everett was paid by the company after July, 1996, and the introduction of considerable evidence that beginning at least by January, 1997, he was working for numerous other employers, we cannot say that a reasonable jury would have been precluded from finding, as they did, that Everett's employment relationship with the company ended (terminated) in 1996.[29]

Everett also gains no benefit by claiming that the 1996-1997 events, which were the subject of the MCAD complaint, and the 1999 events, which were not, are "reasonably related" because both claims "stated the same cause of action and the same discriminatory conduct." The claims are readily distinguishable. The issue in 1996-1997 was whether Everett, newly discharged from a psychiatric hospital and on several antipsychotic medications, was DOT certifiable. This issue was resolved against him in his first grievance by the evaluation of the independent expert, Dr. Lubit, which the company and Everett himself selected. These conclusions permitted the company to terminate (or to refuse to reinstate) him for the lawful reason that he would likely be a danger to himself or others on the road, a point the jury specifically found, and that we discuss at greater length below. In 1999, on the other hand, the issue was whether the company refused for discriminatory reasons to accept Everett's bona fides as a DOT-certified driver who had a clean driving record, had passed numerous physical examinations for other employers, and who claimed he had been in remission since at least 1997. In sum, each claim was supported by distinct factual allegations.[30]

Everett's difficulties on appeal are doctrinal as well as factual. Ordinarily, the decision to terminate or the failure to rehire an employee is considered a discrete, separate act that does not

---

[29]Everett did submit at trial a union seniority list from the company on which his name appeared. The list was dated September 9, 1998, before the 1999 claims arose.

[30]In his Superior Court complaint, Everett also claimed that the company refused to make reasonable accommodation for his perceived disability. See *Tobin* v. *Liberty Mut. Ins. Co.*, 553 F.3d 121, 125 (1st Cir. 2009) ("Under both the ADA and Chapter 151B, employers are required to assist an otherwise qualified employee who has a disability by providing reasonable accommodations that would enable him to perform his job. 42 U.S.C. § 12112[b][5][A]; [G. L. c.] 151B, § 4 [16]"). At a bench conference Everett's counsel expressly waived the reasonable accommodation claims.

draw other allegedly discriminatory acts into its scope, either prospectively or retrospectively. See *Marrero* v. *Goya of P.R., Inc.*, 304 F.3d 7, 18 (1st Cir. 2002), quoting *National Passenger Corp.* v. *Morgan*, 536 U.S. 101, 109 (2002) (distinguishing hostile work environment claims, which are created by "repeated conduct — a series of separate acts that collectively constitute one unlawful employment practice" from discrimination claims, that "occurred," for limitations purposes, "on the day that it happened"). See also *DeFazio* v. *Delta Air Lines, Inc.*, 849 F. Supp. 98, 102 (D. Mass. 1994), quoting *Daughtry* v. *King's Dep't Stores, Inc.*, 608 F.2d 906, 909-910 (1st Cir. 1979) (defendant's termination of employment "is a completed, one-time violation . . . . It was a one-time violation which had a continuing effect on plaintiff's life, but is not a continuing violation of Title VII [of the Civil Rights Act]").

In this case, that the 1999 refusal to employ Everett was discrete from, and unconnected to, the 1996-1997 events assumes a definitive cast by virtue of the jury's finding that the company's decision to terminate Everett in July, 1996, "was due to a reasonable probability of substantial harm to the employee or to others." In other words, the jury found that the initial termination of Everett was lawful. An employer may lawfully "terminate or not hire a handicapped individual" by proving "that there is a 'reasonable probability of substantial harm' to the employee or others." Massachusetts Commission Against Discrimination Guidelines: Employment Discrimination on the Basis of Handicap § X.C.3 (2007). Similarly, the ADA permits employers to require that an individual not "pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b) (2006). Where an initial termination is lawful, an employee is not entitled, solely by virtue of his previous employment, to be rehired on request once he has corrected the grounds of the lawful termination. Rather, he must prove that the employer had a contractual obligation to rehire him, *Benima* v. *Smithsonian Inst.*, 471 F. Supp. 62, 65 (D. Mass. 1979) (presence of continuing "contractual duty" to rehire may, in some instances "justify the finding of a continuing violation"), or that he was discriminated against in the rehiring process by being treated differently from other applicants, particularly those who were previously lawfully discharged. See,

e.g., *Loper* v. *American Airlines, Inc.*, 582 F.2d 956, 958 (5th Cir. 1978) (where plaintiffs' separation from service was lawful, airline bore "no obligation" to rehire employee or to grant plaintiffs seniority credit for prior employment).[31] Everett did not plead that the company violated contractual obligations to him in failing to employ him in 1999; indeed, the arbitration panel hearing this claim found that the collective bargaining agreement did not require that the company hire him in 1999. Nor did Everett show that the failure to hire him in 1999 applied to similarly situated prospective hirees of the company. Everett has claimed in his complaint only that he was entitled "to be put back to work as a truck driver." Because the jury found that the company's 1996-1997 termination was lawful, Everett's reapplication in 1999, standing alone, became an insufficient ground to support a discrimination claim.

In sum, because the 1999 claims were unmoored from the 1996-1997 claims, both factually and as a matter of law, Everett's 1999 claims were not properly before the court; it lacked subject matter jurisdiction to hear them. The company's motion for judgment notwithstanding the verdict should have been allowed on this ground.

4. *Primary jurisdiction.* For the first time on appeal the company raises the issue of primary jurisdiction. In view of our ruling on the company's motion for judgment notwithstanding the verdict, it is not necessary to address the point. We do so for two reasons: to clarify the considerable confusion surrounding the doctrine and because proper application of the doctrine

---

[31]Even when a past termination is discriminatory, if a terminated employee does not file a charge of discrimination within the statutory period, the employer is "entitled to treat [the termination] as lawful." *United Air Lines, Inc.* v. *Evans*, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences"). See *Haynes* v. *Level 3 Communications, LLC*, 456 F.3d 1215, 1226 (10th Cir. 2006), quoting *United Air Lines, Inc.* v. *Evans, supra* (where "present [timely] employment decision was 'neutral in its operation,' the past discriminatory policy could not be the basis" of employee's claim because an employer is " 'entitled to treat that past act as lawful' when [an employee] fail[s] to file a timely charge of discrimination"); *Croy* v. *Cobe Lab., Inc.*, 345 F.3d 1199, 1203 (10th Cir. 2003) ("An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination").

demonstrates that this case should not have proceeded to trial in any event.

Primary jurisdiction is a doctrine "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter* v. *Cooper*, 507 U.S. 258, 268 (1993). See *Murphy* v. *Administrator of the Div. of Personnel Admin.*, 377 Mass. 217, 220-222 (1979). Like subject matter jurisdiction, primary jurisdiction is not waived by the failure of the parties to raise the issue; it may be raised by a court sua sponte. See *Distrigas of Mass. Corp.* v. *Boston Gas Co.*, 693 F.2d 1113, 1117 (1st Cir. 1982) (well established that doctrine of primary jurisdiction "is not waived by the failure of the parties to present it in the trial court or on appeal, since the doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties"). See also *United States Pub. Interest Research Group* v. *Atlantic Salmon of Me., LLC*, 339 F.3d 23, 34 (1st Cir. 2003) (interests served by doctrine of primary jurisdiction "are such that a court may choose to invoke it on its own even if neither side raises the concern").

Although we conclude there is no merit in the company's assertions regarding the effect of primary jurisdiction on the Superior Court's subject matter jurisdiction, see note 34, *infra*, we agree with the company that primary jurisdiction applied throughout this case. See, e.g., *Campbell* v. *Federal Express Corp.*, 918 F. Supp. 912, 919 (D. Md. 1996) (where driver attempts to litigate his DOT qualifications in court rather than DOT, circumstances "militate strongly in favor" of application of primary jurisdiction). Because DOT had exclusive authority over the qualification issue, see note 9, *supra*, the judge was required to refer the issue to the agency. J. L. Mashaw, R. A. Merrill, & P.M. Shane, Administrative Law 1275-1278 (5th ed. 2003) (if agency has exclusive authority over issue before court, then referral to regulatory agency required). The company should have moved to stay the discrimination action, and the judge could have issued a stay sua sponte, to enable the parties to

seek an administrative determination by the DOT concerning Everett's medical qualification to drive commercial motor vehicles.[32]

Everett's first challenge in establishing his prima facie case was to prove by a preponderance of the evidence that he was qualified to perform the job he sought from the company.[33] Once Everett and the company's doctors disagreed whether Everett was qualified to perform his commercial driving duties, Federal law designated him as presumptively unqualified, a status that could only be reversed through an administrative appeal to the DOT. See note 9, *supra.* The question of his qualifications for his job — a dispositive prong of his prima facie case — was not for the jury, or for the judge, but for the DOT, subject to review by the United States Court of Appeals. See, e.g., *Bay* v. *Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) (driver's failure to obtain DOT certification "fatal to his ADA claim"); King *vs.* Mrs. Grissom's Salads, Inc., U.S. Ct. App., No. 98-5258 (6th Cir. July 22, 1999) (summary judgment granted because physician's report for driver's certification "did not qualify him to drive" in light of the conflicting opinion by

[32]A determination that primary jurisdiction over an issue in a civil case resides with an administrative agency requires that the case be stayed or dismissed to permit the administrative agency the opportunity to issue its determination. A court "has discretion either to retain jurisdiction" over the claim by issuing a stay, "or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Reiter* v. *Cooper*, 507 U.S. 258, 268-269 (1993). See *J. & J. Enters., Inc.* v. *Martignetti*, 369 Mass. 535, 540 (1976) (when "dismissal may give rise to serious problems in the application of the statute of limitations," in such cases "the proper course may be to stay the action instead of dismissing it"). Here, where we have found that the court lacked subject matter jurisdiction over the 1999 claims, we will not speculate on subsequent events had the parties or the judge invoked the doctrine of primary jurisdiction at trial.

[33]"To state a prima facie claim of disability discrimination under the ADA, a plaintiff must prove by a preponderance of the evidence that: (1) he was disabled within the meaning of the Act; (2) he was a qualified individual, i.e. able to perform the essential functions of the position with or without reasonable accommodation; and (3) he was discharged because of his disability." *Ward* v. *Massachusetts Health Research Inst., Inc.*, 209 F.3d 29, 32-33 (1st Cir. 2000). "To establish a prima facie case for employment discrimination on the basis of handicap [under G. L. c. 151B], the plaintiff must show that she was terminated, that she is 'handicapped,' that she is a 'qualified handicapped person,' and that she was terminated because of her handicap." *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 449 (2002).

physician for motor carrier); *EEOC* v. *Allied Sys., Inc.*, 36 F. Supp. 2d 515, 522 (N.D.N.Y. 1999) (dismissing driver's ADA discrimination on summary judgment because driver "failed to obtain" determination from DOT "during the time periods at issue," that he was not a qualified individual with a disability); Clark *vs.* Lyman-Richey Corp., U.S. Dist. Ct., No. 8:06CV669 (D. Neb. April 10, 2008) (plaintiff "cannot pursue a claim under the ADA because of his failure to appeal under the administrative remedies provided in the DOT regulations"); Myers *vs.* J.B. Hunt Transp., Inc., U.S. Dist. Ct., No. 1:05CV00717 (M.D.N.C. Nov. 30, 2006) (had driver wanted to challenge physician for motor carrier's "determination that he failed the DOT physical by submitting the determination of a different medical provider who concluded that he passed the DOT physical, the regulations require that he submit an application to the [DOT] for such determination prior to seeking any judicial review"). As numerous courts have held, "It is not reasonable to conclude that Congress could have intended that juries would serve as the ultimate arbiters of the meaning and application of DOT regulations," and that "this is exactly the result that will obtain" if drivers are "permitted to litigate in the first instance the propriety" of a motor carrier's reliance on its physician's recommendations. *Campbell* v. *Federal Express Corp.*, 918 F. Supp. 912, 919 (D. Md. 1996). Everett's recourse in the face of what he considered to be the company's wrongful denial of DOT certification lay with the DOT administrative process. See note 9, *supra*.[34]

5. *Conclusion.* Seldom does an appeal present itself to us in a

---

[34]The company's argument that Everett's failure to exhaust the DOT administrative appeal process and establish his qualifications created a defect in the court's subject matter jurisdiction conflates primary jurisdiction and subject matter jurisdiction. A discrimination claim may be brought in State or Federal court even where one aspect of the claim — in this case commercial driver qualifications — requires agency resolution. But DOT, which has no authority to address Everett's allegations of discrimination, could provide no remedy that could be exhausted. See *Austin Lakes Joint Venture* v. *Avon Utils., Inc.*, 648 N.E.2d 641, 646 & n.5 (Ind. 1995) ("Where at least one of the issues or claims is a matter for judicial determination or resolution, the court is not ousted of subject matter jurisdiction by the presence in the case of one or more issues which arguably are within the jurisdiction of an administrative or regulatory agency"). The exhaustion doctrine is "inapplicable" where an agency has "no power to decree . . . relief." *Reiter* v. *Cooper*, 507 U.S. 258,

posture that requires us to nullify an entire, completed civil jury trial. We recognize that considerable resources were expended by the parties and by the court, and that a judgment of dismissal notwithstanding the verdict is a drastic remedy. However, a fundamental tenet of law is that lack of subject matter jurisdiction is fatal to a plaintiff's claims. See, e.g., *ROPT Ltd. Partnership* v. *Katin*, 431 Mass. 601, 605 (2000) (where court lacks subject matter jurisdiction, "the judgment is void"). We are constrained in the circumstances to add the following observations.

First, Everett was represented by counsel before the MCAD and throughout this action. "When a plaintiff retains an attorney during the limitations period, he or she is charged with constructive knowledge of all procedural requirements." *Conroy* v. *Boston Edison Co.*, 758 F. Supp. 54, 60 (D. Mass. 1991), and cases cited. There is no suggestion that Everett or his counsel were unable to file an MCAD complaint related to events that transpired in 1999.

Second, the issue of subject matter jurisdiction over the 1999 claims was a live issue in this case from its inception. See generally part 2, *supra*. Neither Everett nor his counsel reasonably could be surprised by the appearance of the jurisdictional issue on appeal. Finally, we note the effort by MCAD, both in its amicus brief and in a postargument letter to which there has been no objection by Everett, to voice its objection to Everett's position that the 1999 claims were before the MCAD. We give great deference to the agency's interpretation of its rules and authority. See *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 534 (2001), quoting *Rock* v. *Massachusetts Comm'n Against Discrimination*, 384 Mass. 198, 206 (1982) ("primary responsibility" to determine scope of G. L. c. 151B, § 5, "has been entrusted to the MCAD, not to the courts").

For the reasons stated above, the motion for judgment

269 (1993). The company's conflation of administrative exhaustion and primary jurisdiction "reflects a mistaken understanding of primary jurisdiction," which applies to claims that are already "properly cognizable in court." *Id.* at 268. "[D]ismissing a case" for lack of subject matter jurisdiction "in order to get an agency opinion on one issue," rather than applying primary jurisdiction to stay or dismiss the case (see note 32, *supra*), "is tantamount to confusing primary jurisdiction with the exhaustion doctrine." J.L. Mashaw, R.A. Merrill, & P.M. Shane, Administrative Law 1278 (5th ed. 2003).

notwithstanding the verdict should have been allowed. We set aside the jury verdict and the award of fees and costs, and remand the case to the Superior Court for the entry of a judgment of dismissal.

*So ordered.*