# Kim Pelletier *vs.* Town of Somerset & another.[1]

Bristol. September 8, 2010. - December 10, 2010.

Present: Marshall, C.J., Ireland, Spina, Cordy, Botsford, & Gants, JJ.[2]

*Anti-Discrimination Law,* Sex, Homosexuality, Employment, Damages. *Employment,* Discrimination, Constructive discharge. *Massachusetts Commission Against Discrimination. Practice, Civil,* Statute of limitations, Instructions to jury, Judgment notwithstanding verdict, New trial. *Damages,* Remittitur.

Discussion of the application of the so-called "scope of the investigation" rule in a civil action commenced in the Superior Court, alleging discrimination in employment, following the filing of a complaint with the Massachusetts Commission Against Discrimination. [513-515]

In a civil action claiming, inter alia, discrimination in employment, the Superior Court did not lack jurisdiction over the plaintiff's claims of discriminatory treatment, sexual harassment, and hostile work environment allegedly occurring during the time period that a certain individual was the plaintiff's supervisor, where the Massachusetts Commission Against Discrimination (commission), in reviewing the plaintiff's complaint before the commission, had improperly limited the scope of its investigation of those claims [515-517]; however, the judge erred in admitting evidence of other claims that the commission could not reasonably have been expected to uncover prior to its issuance of a finding of lack of probable cause [517-519]; further, the erroneous admission of that evidence required a new trial, where the judge's ordering of a remittitur did not adequately remedy the prejudice caused to the defendant [521-523].

At the trial of a civil complaint claiming, inter alia, discrimination in employment, the judge properly instructed the jury to consider whether, under the continuing violation doctrine, the plaintiff should be allowed to recover for discrimination alleged to have occurred outside the applicable statute of limitations. [520-521]

At the trial of a civil complaint claiming discrimination in employment based on gender and sexual orientation, sexual harassment, and hostile work environment, as well as constructive discharge, the judge properly denied the employer's motion for judgment notwithstanding the verdict, where sufficient evidence was presented to the jury to sustain the plaintiff's case. [523-524]

This court concluded that, in a civil action, a party is not precluded from challenging an order of remittitur on cross appeal, provided the opposing party has appealed from the judgment first. [524-525]

---

[1]Somerset Highway Department (collectively, the town).

[2]Chief Justice Marshall participated in the deliberation on this case prior to her retirement.

CIVIL ACTION commenced in the Superior Court Department on June 30, 2003.

The case was tried before *Richard T. Moses,* J., and a motion for a new trial or, in the alternative, for remittitur, filed May 17, 2007, was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Carlin J. Phillips (Joseph P. Fingliss, Jr.,* with him) for the plaintiff.

*David D. Dowd* for the defendants.

*Beverly I. Ward & Catherine Ziehl,* for Massachusetts Commission Against Discrimination, amicus curiae, submitted a brief.

BOTSFORD, J. The plaintiff, Kim Pelletier, worked as a laborer for the highway department of the town of Somerset (town) from 1984 to 2000. In 2003, after first filing a complaint with the Massachusetts Commission Against Discrimination (MCAD), the plaintiff commenced an action in the Superior Court against the town and the highway department seeking damages for discriminating against her on the basis of gender and sexual orientation, for subjecting her to sexual harassment and a hostile work environment, and for constructive discharge. After a trial lasting six days, a jury awarded the plaintiff compensatory and punitive damages against the town.[3] Concluding that "a substantial portion of the evidence presented by Pelletier at trial was not within the scope of the MCAD complaint or discovery provided incidental thereto," the trial judge allowed the remittitur portion of the town's motion for a new trial or in the alternative for remittitur, and ultimately reduced the jury verdict to $200,000 in compensatory damages and $400,000 in punitive damages,

---

[3] In her Superior Court complaint, the plaintiff named as defendants, the town of Somerset (town), the Somerset highway department, John McAuliffe (then the town administrator), Charles Schofield (a former superintendent of and later consultant to the highway department), and Antone Cabral (a foreman with the highway department). On the first day of trial, the parties stipulated to the dismissal of the three individual defendants with prejudice and without costs. While the special verdict slip presented to the jury mentioned only the town as the defendant, the judgment entered in the Superior Court was against both the town and the highway department. There is no disagreement that the highway department is an agency of the town, and therefore we refer to the town as the sole remaining defendant.

plus attorney's fees and costs pursuant to G. L. c. 151B. The plaintiff elected to accept the remittitur.

The town thereafter appealed from the ensuing Superior Court judgment, the plaintiff cross-appealed, and we granted the plaintiff's application for direct appellate review. We apply the scope of investigation rule and conclude that the scope of the MCAD investigation in this case should have been expected to cover the plaintiff's various claims of discriminatory treatment, sexual harassment, and hostile work environment allegedly occurring during the time period that Antone Cabral was her supervisor, but not her claims of discrimination relating to alleged events and incidents that preceded Cabral's supervisory tenure. These earlier incidents were "separate and distinct both qualitatively and temporally," *Lattimore* v. *Polaroid Corp.*, 99 F.3d 456, 465 (1st Cir. 1996), from what could reasonably be considered as within the range or reach of the MCAD's investigation. Because, however, a significant amount of evidence presented at trial concerned these earlier incidents, the town is entitled to a new trial on liability as well as damages. With respect to other issues raised by the parties on their cross appeals, we conclude that the judge properly denied the town's motion for judgment notwithstanding the verdict; we also conclude that where a plaintiff accepts an order of remittitur but the defendant nevertheless appeals from the judgment, the plaintiff is not precluded from challenging the remittitur on cross appeal.[4]

*Background.* We begin with a recitation of undisputed facts that were presented at trial; additional facts are later described in connection with our discussion of the issues.

The plaintiff worked as a laborer for the town's highway department starting in 1984. By 2000, she had risen to the level of senior truck driver. Except for summer interns, she was the only woman in the highway department for the entire period of her employment. The plaintiff is a lesbian, as her supervisors knew.

Antone Cabral joined the highway department in 1996 as a

---

[4]In light of our determination that the town is entitled to a new trial, we do not reach its claim that the punitive damages awarded in this case were unwarranted or excessive. For the same reason, we also do not reach the issue raised by the plaintiff as to whether postjudgment interest accrues from the original date of the jury verdict or from the date of the later amended judgment.

laborer and became a foreman in August of 1998. Once he became foreman, Cabral was the plaintiff's supervisor and responsible for assigning the plaintiff and other employees to assignments and tasks.[5] In August, 1999, the plaintiff injured her back at work and was out of work for approximately nine months. When she returned in May, 2000, Cabral was once again her immediate supervisor.

In the summer of 2000, the plaintiff filed a grievance under her collective bargaining agreement concerning Cabral's alleged discriminatory mistreatment of her.[6] After a contentious hearing held on September 7, 2000, and presided over by John Mc-Auliffe, the town administrator, the town formally denied the grievance. Thereafter, the plaintiff's relationship with her employer deteriorated further, the plaintiff claimed she could no longer work for the highway department, and she did not return to work there after October 23, 2000.[7]

On October 18, 2000, the plaintiff filed a complaint with the MCAD; she was not then represented by counsel. The complaint named the highway department as the respondent and alleged discrimination on the basis of gender and sexual orientation. The narrative portion of the complaint alleged that the plaintiff's supervisor Cabral "engaged in a pattern of harassment and disparate treatment against [her]," including treating her differently than male coworkers, specifically by restricting her from

---

[5] As one of two or three foremen, Cabral supervised laborers in the highway department; he and the other foremen reported to the superintendent of the highway department.

[6] The plaintiff's grievance asserted discrimination and sexual harassment on the basis of four incidents occurring on the following dates in the spring and summer of 2000: (1) May 24, when Cabral compared the plaintiff's speed in cutting grass unfavorably with that of his "guys"; (2) June 28, the "forbidden fruit" incident, discussed in more detail *infra*; (3) July 14, an incident at the town transfer station also discussed later in more detail; and (4) July 20, when Cabral criticized the plaintiff for taking her break early.

[7] As of 2000, the plaintiff held a second job at a State park, but she was injured in a motor vehicle accident on September 8, 2001, and became too disabled to work. She remained an employee of the town, receiving benefits, sick pay, and holiday pay, until March, 2004, when her employment was formally terminated because she could not perform the essential functions of the position. At trial, the parties stipulated that the plaintiff's lost wages claim would be limited to the period from October 23, 2000, when she stopped performing work for the town, to September 8, 2001, when she became disabled by the automobile accident.

driving certain trucks. It ended with the statement that the plaintiff believed she was "subject to harassment and discriminatory terms and conditions of employment based on [her] sexual orientation and gender."

The MCAD complaint also offered details of two of the incidents that had formed the basis of the plaintiff's union grievance. The first was what the parties refer to as the "forbidden fruit" incident.[8] On June 28, 2000, after a prolonged argument over which truck the plaintiff should use, Cabral had accused the plaintiff of liking to give him a hard time, and said to her, "You want the forbidden fruit. You want what the men have." Although she did not interpret the comment as sexual at the time, the plaintiff later spoke with her union shop steward about the incident. The shop steward and, according to the plaintiff, "all the guys" who worked in the highway department interpreted "forbidden fruit" as a sexual reference.[9] The second incident occurred a few weeks later on July 14, 2000, when the plaintiff was monitoring dumpsters at the town transfer station. When Cabral discovered that metal had been placed in the wrong dumpster, he told her that if she could not otherwise do her job right, she should "tie [herself] down to the chair."

In early 2001, having engaged counsel, the plaintiff participated with the town in what the MCAD refers to as "predetermination discovery."[10] Consistent with the MCAD complaint, the focus of this discovery remained entirely on interactions in

[8]The descriptions of the incidents set out here in the text draw on testimony developed during trial. The descriptions in the complaint filed with the Massachusetts Commission Against Discrimination (MCAD) were more succinct but apparently sufficient to trigger the MCAD investigation that followed the plaintiff's filing of her complaint. Although the parties differ in their interpretations of these incidents, the basic facts about what happened appear uncontested.

[9]The only witness to the argument between the plaintiff and Cabral gave conflicting testimony about whether he interpreted "forbidden fruit" as a sexual reference. Cabral insisted he referred only to the truck the plaintiff had wanted to drive, and that nothing he said amounted to sexual harassment.

[10]As the MCAD has explained in its amicus brief filed with this court, from late 1999 or early 2000 until 2007, the MCAD investigating commissioner routinely authorized represented parties to engage in "*limited* pre-determination 'discovery' " (emphasis in original) for the purpose of assisting the commissioner's investigation. See 804 Code Mass. Regs. § 1.13(7) (1999). Predetermination discovery resembles pretrial discovery in a civil case, but absent a special order from the investigating commissioner, each party is

2000 between the plaintiff and Cabral. Asked in a predetermination discovery deposition whether she thought she was "treated fairly by everyone but Mr. Cabral," the plaintiff responded, "Yes." She answered an interrogatory in a similar fashion. In June, 2001, the MCAD's predetermination discovery process ended. Approximately two months later, in August, 2001, the plaintiff changed counsel.

Through her new counsel, the plaintiff reframed her allegations of discrimination. The plaintiff and the town each submitted a memorandum of law to the MCAD in the fall of 2001 on the issue whether probable cause existed to believe the town committed an unlawful practice.[11] The plaintiff's memorandum, submitted in September, 2001, described Cabral's interaction with the plaintiff as "intimidating," as well as "demeaning, derogatory, and hostile." Cabral allegedly engaged in a "pattern of unequal treatment" between male employees and the only female employee of the highway department, the plaintiff. The plaintiff stated in the memorandum that she "began experiencing Mr. Cabral's discriminatory actions from the onset of his appointment to foreman," and indicated that the discriminatory, hostile work environment she was experiencing under Cabral represented a distinct change from the past.

In the same memorandum, the plaintiff claimed that the hostile work environment extended beyond the actions of Cabral personally. She asserted that "it was common practice among all male employees to keep [p]ornographic [p]eriodicals such as 'Playboy' and 'Penthouse' magazines inside each town truck"

---

subject to lower limits on the number of interrogatories and document requests (fifteen combined) and a six-hour limit on depositions. *Id.* The MCAD has since modified its process such that predetermination discovery orders are issued only "in appropriate cases" instead of in all cases involving represented parties as a matter of course. See Standing Order of the Commissioners Regarding Pre-Determination Case Process (Feb. 20, 2007). However, the MCAD has not amended its regulations in connection with this change in practice. See 804 Code Mass. Regs. § 1.13(7)(a) (1999).

[11]The memorandum was submitted in anticipation of a "probable cause" finding. The MCAD regulations define "probable cause" as follows: "A finding of [p]robable [c]ause shall be made when, after appropriate investigation, the [i]nvestigating [c]ommissioner concludes that there is sufficient evidence upon which a fact-finder could form a reasonable belief that it is more probable than not that the respondent committed an unlawful practice." 804 Code Mass. Regs. § 1.15(7)(a) (2008).

and that "there was also an assortment of pornographic periodicals kept within the dispatche[rs'] desk draw[er]s." The plaintiff also complained about the interfering, threatening, and coercive actions of the town administrator in dealing with the plaintiff's ongoing sexual harassment complaint that was the subject of her grievance.[12] The plaintiff claimed that work-related "anxiety, depression, insomnia, and nightmares" resulted in her leaving work on October 23, 2000, and not returning. The MCAD indicated, however, that with the agency's pre-determination discovery process closed, it was no longer willing to follow up on new lines of inquiry. On November 6, 2001, the agency granted a motion by the town to "strike" the portions of the memorandum of law dealing with pornography.

Sixteen months later, on March 3, 2003, the investigating commissioner of the MCAD issued a finding of lack of probable cause (LOPC finding).[13] A supporting memorandum rejected complaints of gender discrimination, sexual orientation discrimination, sexual harassment, and constructive discharge. The memorandum made no mention of the plaintiff's allegations of pornography. It did mention that the plaintiff's September, 2001, memorandum (but not her MCAD complaint) had alleged constructive discharge, but concluded that "the evidence does not demonstrate that a reasonable person in the [c]omplainant's position would have felt compelled to resign."

The plaintiff filed an administrative appeal from the LOPC finding. See 804 Code Mass. Regs. § 1.15(7)(d) (1999). In her April 22, 2003, memorandum in support of the appeal, the plaintiff reiterated her earlier allegations of pornography, submitting supporting affidavits from herself and four coworkers, and introduced two new allegations: that Frank Mullaly, a highway department superintendent, had seen her bent over a broken snow plow, slapped her buttocks, and made a sexually explicit

---

[12]As more fully developed at trial, the town administrator, John McAuliffe, threatened to discipline the plaintiff for calling him "Hun" during the grievance hearing. McAuliffe also pressured the shop steward to reconsider his view that "forbidden fruit" had sexual connotations and threatened to discipline him if he discussed the incident.

[13]An LOPC finding by the MCAD does not preclude the filing of a complaint in the Superior Court. See G. L. c. 151B, § 9; 804 Code Mass. Regs. § 1.24(2) (1999).

comment; and that a coworker, Mike L'Heureaux, had called her a "d[y]ke" and made a sexually explicit comment to her. The plaintiff provided no dates for these alleged incidents involving Mullaly and L'Heureaux. The town again filed a motion to strike portions of the plaintiff's appeal that went beyond the scope of the internal discovery process.[14] On June 20, 2003, the investigating commissioner of the MCAD affirmed his earlier LOPC finding with little discussion, and no mention of the plaintiff's specific allegations suggesting hostile work environment, new or old. See 804 Code Mass. Regs. § 1.15(7)(d). Ten days later, on June 30, 2003, the plaintiff filed her complaint in the Superior Court; the MCAD regarded its case closed.[15]

The plaintiff's Superior Court complaint is brief and very general. It alleges that the town and the highway department discriminated against her on the basis of her gender and sexual orientation by subjecting her to a sexually hostile work environment. It further alleges that "the [d]efendant" subjected her to disparate treatment based on her sexual orientation and gender and violated the town's sexual harassment policy "by making comments about the [p]laintiff's sexual activity, displaying sexually suggestive periodicals, pictures, and cartoons, and making suggestive or insulting comments regarding the [p]laintiff's sexuality." Although the complaint names three individual defendants (see note 3, *supra*), it contains no specific allegations concerning any one of the three, and no allegations of inappropriate physical touching of or contact with the plaintiff by anyone.

In the Superior Court the parties engaged in discovery, but the defendants did not file any dispositive motion before trial. In a joint pretrial memorandum dated June 5, 2006, the plaintiff stated she had "tolerated minor instances of sexual harassment throughout her tenure with the [town]" but characterized the Cabral era as distinctly different in that "said instances increased sharply to an outrageous and intolerable level." Trial of the case commenced on March 19, 2007. The plaintiff supplemented the pretrial memorandum on March 13, 2007, one week before trial, by adding the names of three witnesses, but proposed no

---

[14]There is nothing in the record that indicates the motion was acted on.

[15]The MCAD's jurisdiction ends when a petitioner files a complaint in the Superior Court. G. L. c. 151B, § 9, second par.

other changes. Then, in a motion in limine filed on March 13, the plaintiff argued that under the standard announced in *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521 (2001) (*Cuddyer*), a pattern of harassing conduct at the highway department dating back to the 1980s should be admissible at trial and that the jury should decide whether the continuing violation doctrine entitled the plaintiff to relief.[16] Some of the conduct to which the motion referred had never been raised while the case was pending before the MCAD, either before or after the LOPC finding, nor had it appeared in the joint pretrial memorandum. After a hearing and over the town's objection, the judge ruled that he would instruct the jury pursuant to *Cuddyer*.

At trial, over objections by the town, the judge permitted the plaintiff to present evidence of alleged incidents that ranged over the full course of her career at the highway department, from the 1980s to 2000. Testimony included alleged incidents of inappropriate physical touching by a coworker in the late 1980s and by Mullaly, the superintendent, in the late 1980s and early 1990s. It also covered allegations that pornographic materials permeated the department for many years before Cabral was even employed by the town. Stated more generally, testimony at trial focused on allegations actually investigated by the MCAD, allegations raised with the MCAD that the agency had expressly refused to consider, and allegations first referenced in the plaintiff's motion in limine filed six days before the start of trial. In answers to special verdict questions, the jury concluded that the town had discriminated against the plaintiff based on her gender or sexual orientation, or both, and awarded $625,000 in compensatory damages and $1.25 million in punitive damages.

On May 17, 2007, the town filed a motion for judgment notwithstanding the verdict (motion for judgment n.o.v.), as well as a motion for a new trial or, in the alternative, for remittitur. On December 3, 2007, the judge denied the town's motion for

---

[16]As we discuss in more detail later in this opinion, the continuing violation doctrine allows a plaintiff to claim damages based on events occurring outside the statute of limitations period of six months (now 300 days, see note 31, *infra*) that would otherwise apply where the "alleged events are part of an ongoing pattern of discrimination" and certain other requirements are met. *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 532 (2001) (*Cuddyer*). See 804 Code Mass. Regs. § 1.10(2) (1999).

judgment n.o.v. but allowed the alternative motion for remittitur. In particular, the judge allowed the plaintiff to elect remitttitur by reducing her damages to $200,000 compensatory damages and $100,000 punitive damages; otherwise a new trial would be granted.[17] On December 21, 2007, the plaintiff filed an emergency motion for reconsideration. In response, on March 21, 2008, the judge reiterated that evidence presented to the jury went "far beyond that which was even sought to be asserted before the MCAD." However, he altered the remittance amounts to $200,000 in compensatory damages and $400,000 in punitive damages. On April 8, 2008, the plaintiff accepted the revised order of remittitur.[18] The parties' cross appeals followed.

*Discussion.* 1. *The town's appeal.* a. *Scope of investigation and new trial.* The town's principal claim on appeal is that the Superior Court lacked jurisdiction over many of the claims that the plaintiff presented as part of her case at trial because they were not included in her complaint filed with the MCAD and the resulting scope of the MCAD's investigation. As a consequence, the town argues, evidence relating to these claims should not have been admitted at trial, and the error requires as a remedy a new trial on all issues of liability as well as damages; the granting of a remittitur is not an appropriate cure. We agree that a substantial amount of evidence presented to the jury contravened the scope of investigation rule, was properly objected to by the town, and should have been excluded; and that, in the circumstances, a new trial on all aspects of the case is necessary.

i. *Scope of investigation.* The Legislature has charged the MCAD with addressing certain types of discrimination in the Commonwealth, including discrimination based on gender, sexual orientation, and sexual harassment.[19] G. L. c. 151B, § 4 (1). G. L. c. 151B, § 1 (18). See, e.g., *Haddad* v. *Wal-Mart Stores, Inc. (No. 1)*, 455 Mass. 91, 92 (2009) (gender discrimination);

---

[17]Rule 59 (a) of the Massachusetts Rules of Civil Procedure, 365 Mass. 826 (1974), requires that "[a] new trial shall not be granted solely on the ground that the damages are excessive until the prevailing party has first been given an opportunity to remit so much thereof as the court adjudges is excessive."

[18]The plaintiff was also awarded attorney's fees and costs totaling $254,294.54.

[19]As defined in G. L. c. 151B, § 1 (18), "[t]he term 'sexual harassment' shall mean sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such advances, requests or

*Cuddyer*, 434 Mass. at 522 (sexual harassment); *Salvi* v. *Suffolk County Sheriff's Dep't*, 67 Mass. App. Ct. 596, 597 (2006) (sexual orientation discrimination). Before a complaint may be filed in the Superior Court, a plaintiff must first file with the MCAD "a verified complaint in writing" that is to "set forth the particulars thereof and contain such other information as may be required by the [MCAD]." G. L. c. 151B, § 5. See G. L. c. 151B, § 9. The purpose of the administrative filing is "(1) to provide the MCAD with an opportunity to investigate and conciliate the claim of discrimination; and (2) to provide notice to the defendant of potential liability." *Cuddyer*, *supra* at 531. See *Everett* v. *357 Corp.*, 453 Mass. 585, 600 (2009) (*Everett*).

As we explained in *Everett*, the administrative investigation creates the factual platform for the finding by the MCAD of probable cause or the lack of probable cause. *Id.* at 602. In addition, the MCAD complaint and potential investigation establish the scope of any subsequent filing in the Superior Court. *Id.* at 602-603. Under the "scope of the investigation" rule, "a claim that is not explicitly stated in the administrative complaint may be asserted in the subsequent Superior Court action so long as it is based on the acts of discrimination that the MCAD investigation could reasonably be expected to uncover."[20] *Id.* at 603, quoting *Windross* v. *Village Automotive Group, Inc.*, 71 Mass. App. Ct. 861, 864-865 (2008) (*Windross*). See *Ianetta* v. *Putnam Invs., Inc.*, 142 F. Supp. 2d 131, 134 (D. Mass. 2001) ("It

conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment."

[20]The requirement that a complaint of employment discrimination be filed first at the MCAD serves in part to encourage and inform an internal investigation by an employer. As this court explained in *Cuddyer*, the MCAD complaint process is intended "to provide notice to the defendant of potential liability." *Cuddyer*, 434 Mass. at 531. Just as the scope of the investigation before the MCAD is defined by what the MCAD reasonably may be expected to uncover, that scope may also be defined by what one might anticipate and expect that an employer, investigating in good faith a complaint of discrimination by one of its employees, would discover. See *Lattimore* v. *Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir. 1996) ("The purpose of [the administrative charge] requirement is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation").

is irrelevant whether the agency actually investigates the claim"). Cf. *Borase* v. *M/A-COM, Inc.*, 906 F. Supp. 65, 68 (D. Mass. 1995), quoting *Oglesby* v. *Coca-Cola Bottling Co.*, 620 F. Supp. 1336, 1344 (N.D. Ill. 1985) ("What controls is not what the [agency] did but what it was given the opportunity to do").

Whether elements of a claim fall within the scope of an MCAD investigation presents a question of law for judicial determination. See *Everett*, 453 Mass. at 606-608. More particularly, in connection with a jury trial on a c. 151B claim in the Superior Court, it is the role of the judge to exclude evidence that lies outside the scope of a claim; determining the scope is not an issue of fact for the jury. See, e.g., *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 119-120 (2000) (judge's role to determine whether evidence of racial bias was relevant where plaintiff alleged national origin discrimination).

A. *Cabral era claims.* Because evidence of matters outside the scope of the MCAD investigation are not properly admissible in a subsequent Superior Court case, a critical determination in this case is the scope of the investigation. As previously described, through her MCAD complaint and the investigation that ensued, the plaintiff attempted to spur investigation of a set of accusations related to the period during which Cabral was her supervisor. That the MCAD failed to investigate many of the plaintiff's charges linked to the Cabral supervisory era did not preclude the plaintiff from raising in her Superior Court action "acts of discrimination that the MCAD investigation could reasonably be expected to uncover," even if it did not. See *Everett*, 453 Mass. at 603. Matters alleged in the administrative complaint, including specific alleged actions by Cabral as well as a more general alleged "pattern of harassment and disparate treatment" by Cabral, were clearly within the scope of the investigation. So too were matters that went beyond the MCAD complaint but were actually investigated, notably the allegation of constructive discharge acknowledged by the MCAD in the staff memorandum supporting the LOPC finding.

What else the MCAD "could reasonably be expected to uncover" is complicated by the agency's refusal to investigate many of the plaintiff's allegations. In the amicus brief it has filed in this case, the MCAD has acknowledged that it may

have erred in disregarding evidence brought to its attention in the course of its investigation.[21] The MCAD's duty is to investigate and assess charges of discrimination, not to close down lines of inquiry through inflexible application of procedural rules that the agency itself currently suggests may be inappropriate. See note 10, *supra.* See also G. L. c. 151B, § 5.

In this context, it is significant that the plaintiff's September, 2001, memorandum filed with the MCAD described a culture of misconduct that went beyond individual actions by Cabral. From September, 2001, onward, both the MCAD and the town could reasonably be expected to have followed up on charges made in that memorandum. Moreover, even before the MCAD complaint, the town was on notice that pornography was an issue of concern within the highway department.[22] Once the plaintiff filed her MCAD complaint, the town as well as the MCAD easily could have investigated whether pornographic materials littered the department's facilities and trucks, as the September, 2001, memorandum alleged.[23] They also could have

---

[21]As stated in its amicus brief, the MCAD takes the position that to the extent the investigating commissioner struck from the administrative record allegations regarding Playboy and Penthouse magazines that, as discussed *supra*, were raised by the plaintiff in the memorandum filed by her counsel while the MCAD investigation was still pending in 2001, the commissioner was "likely" in error.

[22]The town administrator acknowledged that he knew in August or September of 2000 that the plaintiff claimed there were pornographic materials in the department. Furthermore, in the summer of 1998 or 1999, the department foremen ordered that all pornography be removed from department facilities and trucks in response to a complaint lodged by a female summer intern; after the intern left, the materials filtered back. This event suggests the department understood the adult magazines were offensive and took steps to remove them from the presence of a female intern but took no similar steps in relation to the plaintiff.

[23]By most accounts at trial, pornography was present, or even pervasive, in the facilities and trucks of the highway department. Witnesses testified at trial that "adult" magazines were in highway department trucks, desk drawers, the men's locker room, and break areas. One witness, an employee who joined the highway department around the time that Cabral became a supervisory foreman, when asked at trial where the pornography was, said it would be easier to explain where it was not. On one or more occasions, workers watched pornographic videotapes in the break room, within earshot of the plaintiff. The timing of these incidents is not always clear from the record, but Cabral acknowledged that he was aware of the existence of "pornography materials" while he was a foreman.

looked into the plaintiff's claim in the September, 2001, memorandum that the town administrator subverted the grievance process in a manner underscoring the plaintiff's claim of discriminatory and hostile work environment.

Furthermore, knowing that the plaintiff claimed generally to view her work environment under Cabral as sexually harassing and hostile, the MCAD reasonably could be expected to have investigated and uncovered other aspects of offensive treatment in that environment, including allegedly improper speech or conduct by coworkers.[24] Instead, the MCAD acceded to the town's request to strike from the record suggestions of more pervasive problems during the Cabral era, on the ground that the predetermination discovery period of approximately four months had closed, even though the MCAD's own investigation remained open for an additional sixteen months.

The town argues that in light of the plaintiff's specific allegations in her MCAD complaint, the appropriate scope of investigation in this case is confined to Cabral himself and nothing else. This perspective is far too restrictive. For the reasons just stated, we conclude that the scope of investigation in this case spanned what the MCAD and the town might reasonably have uncovered had they made efforts to do so, including all allegations of unlawful conduct — gender discrimination, sexual orientation discrimination, hostile work environment, sexual harassment, and constructive discharge — experienced by the plaintiff at the highway department from the time that Cabral became foreman until the time the plaintiff left her job.

B. *Pre-Cabral era claims.* The shortcomings of the MCAD investigation do not, however, open the door to all the plaintiff's subsequent claims. While the town and the MCAD were on notice of allegedly widespread discriminatory conduct during Cabral's tenure as her supervisor, neither the plaintiff's MCAD complaint nor her submissions to the MCAD before the LOPC finding issued would have provided reason to investigate earlier events.

In particular, in framing her allegations in the MCAD

[24]At trial, for example, Joseph Duarte, who worked as a laborer for the highway department from some time in 1999 until August of 2000, testified that the plaintiff was referred to in the plaintiff's own presence as "carpet muncher, stuff like that; you know? Diesel dyke."

complaint in terms of suffering from unlawful behavior during Cabral's tenure, the plaintiff made a direct contrast between that time and her experiences during her first fifteen years of employment with the highway department. In the September, 2001, memorandum to the MCAD, the plaintiff's counsel wrote: "Prior to the period when [the plaintiff] was directly under Foreman Cabral's supervision, her work career at the Somerset Highway Department was uneventful concerning her work relationship with her co-workers and her supervisors . . . . She was held in respect by her peers and counted on by her superiors." After Cabral became supervisor, the memorandum explained, the "atmosphere changed drastically." It was only after the MCAD issued its LOPC finding on March 3, 2003, thus essentially closing its investigation, see *Everett,* 453 Mass. at 602, that the plaintiff raised pre-Cabral incidents. As we have previously detailed, in connection with her administrative appeal from the LOPC finding, the plaintiff introduced what in fact were allegations of allegedly discriminatory conduct that predated Cabral without directly explaining when the events described had occurred.[25] The plaintiff herself appeared not to attach much importance to these events even in her Superior Court action until six days before trial when she filed her second motion in limine. Only there did the plaintiff expressly state that the pattern she alleged dated back to the 1980s.

At trial, the plaintiff testified extensively about events that occurred while Mullaly was superintendent, meaning before approximately 1994.[26] The plaintiff told the jury that she had protested to Mullaly in the late 1980s when a coworker grabbed her breasts. She recounted in some detail the Mullaly snow plow incident when she claimed he slapped her buttocks. She was also permitted to introduce evidence at trial that, around 1992, Mullaly was criminally charged with (although later acquitted of) sexually inappropriate conduct with female summer interns. In another incident, allegedly occurring during Mullaly's

[25]Because Mullaly left the town's employment around 1994, it would have been clear to the town that at least one of the incidents mentioned in the memorandum happened before the Cabral era; MCAD investigators may or may not have had sufficient information to reach that conclusion.

[26]We detail these allegations because they may have formed the basis for the jury verdict. See part 1.a.iii, *infra.*

pre-1994 tenure, the plaintiff discovered that a janitor had been touching her underwear in the women's locker room; when she complained to Mullaly, he only laughingly scolded the janitor. Also apparently during this same time frame (the trial testimony is not wholly clear as to time), a coworker barged into the women's bathroom while the plaintiff was on the toilet.[27] All together, the evidence at trial suggested unlawful behavior spanning more than a decade through several changes in management.[28]

The expansive temporal reach and character of the plaintiff's trial evidence simply was not within the scope of the MCAD investigation. Nothing in the plaintiff's MCAD complaint, her September, 2001, memorandum, or anything else in the record suggests that, prior to the LOPC finding, the MCAD "could reasonably be expected to uncover" the types of incidents just described that involved physical contact and harassing behavior that occurred years before Cabral became a foreman. The MCAD had no reason to look back that far; the town also was not on notice that plaintiff considered pre-Cabral disputes to be live issues.[29] To allow a plaintiff to withhold notice of the scope of a complaint until after the LOPC finding issues is unfair to her employer and inconsistent with the statutory framework as well. See *Everett*, 453 Mass. at 602, quoting *Windross*, 71 Mass. App. Ct. at 864 ("The purposes of G. L. c. 151B 'would be frustrated if the claimant were permitted to allege one thing in the MCAD complaint only to allege something entirely different in the ensuing civil action' ").

---

[27] Some of the testimony at trial as to continuing behaviors, such the use of "diesel dyke" and other offensive terms by Mike L'Heureaux and other coworkers and sexually explicit propositions by Eddie Fernandes and others, is ambiguous as to time frame. The plaintiff testified that she complained of Fernandes's behavior to Mullaly, so some of the incidents seem to predate Cabral. However, trial testimony does not address whether Fernandes continued to be employed by the town after Mullaly left.

[28] Trial testimony refers to at least three highway department superintendents and several foremen over the sixteen-year span of the plaintiff's employment with the highway department.

[29] Arguably the plaintiff did provide enough information for the MCAD and the town to discover during the MCAD investigation that pornography long predated the Cabral era. However, the thrust of the plaintiff's charges during the MCAD process was that the workplace culture under Cabral was hostile to the plaintiff, and that this hostile environment stood in sharp contrast to the generally respectful atmosphere that predated Cabral.

ii. *Continuing violation doctrine.* Discrimination claims are subject to statutes of limitation. For claims arising prior to November 5, 2002 (see St. 2002, c. 223, § 1), a complaint alleging gender discrimination had to be filed with the MCAD within six months of the occurrence of the alleged discriminatory event or events and with the Superior Court within three years after the alleged unlawful practice occurred.[30] G. L. c. 151B, § 5, as amended through St. 1989, c. 722, §§ 24-29. G. L. c. 151B, § 9.[31] Chapter 151B discrimination complaints must be brought within these prescribed periods, but where alleged misconduct forms a pattern of behavior, the continuing violation doctrine applies. *Cuddyer*, 434 Mass. at 531-534. That doctrine permits a person to seek damages for alleged discrimination occurring outside the usual statute of limitations period if the alleged events are part of an ongoing pattern of discrimination, and there is a discrete violation within the statute of limitations period to anchor the earlier claims. *Id.* at 541. A plaintiff with a hostile work environment claim[32] often invokes the continuing violation doctrine in order to recover for otherwise time-barred violations. *Id.* at 532. "Incidents of sexual harassment serious enough to create a work environment permeated by abuse typically accumulate over time, and . . . seemingly disparate incidents may show a prolonged and compelling pattern of mistreatment that have forced a plaintiff to work under intolerable, sexually offensive, conditions." *Id.* at 532-533.

In *Cuddyer*, we emphasized that it is the role of the jury to make critical factual determinations whether events constitute

---

[30]Neither party has raised the question concerning the impact, if any, of the three-year statute of limitations in G. L. c. 151B, § 9, on this case. See S.C. Moriearty, J.F. Adkins, L.F. Rubin, & D.J. Jackson, Employment Law § 8.57, at 564-565 (2d ed. 2003). We will not consider it where it has not been preserved as an issue in the court below. See *Cuddyer*, 434 Mass. at 540 n.23.

[31]Chapter 223 of St. 2002 extended the time for filing a complaint with the MCAD to 300 days. See G. L. c. 151B, § 5, as amended through St. 2002, c. 223, § 1. See also St. 2002, c. 223, § 4. The section has since been further amended, but those changes are not relevant to this case.

[32]A hostile work environment is one that is "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace." *Cuddyer, supra* at 532, quoting *College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 162 (1987).

elements of a continuing violation. See *id.* at 540-542. In particular, the jury must decide whether the plaintiff has shown a pattern of harassment, whether at least one anchoring event that constitutes actionable discretionary conduct occurred within the statute of limitations period, and whether the plaintiff knew or reasonably should have known before that period that the work situation was pervasively hostile and unlikely to improve.[33] *Id.* at 541.

The difficulty posed by the *Cuddyer* instruction in the present case is not that it was in error, but that it was in part misapplied. The continuing violation doctrine may complement but cannot replace the scope of evidence rule. That is, both the scope of the investigation and the statute of limitations potentially limit a plaintiff's discrimination claim, but the two operate independently of each other. The scope of the investigation must be determined, therefore, whether or not the continuing violation doctrine might also apply to expand the statute of limitations in G. L. c. 151B. The judge properly instructed the jury to consider whether, under the continuing violation doctrine, the plaintiff should be allowed to recover damages based on certain events that occurred within the time frame of Cabral's supervisory tenure but outside the six-month statute of limitations period. However, before the jury heard it, the judge also should have excluded evidence that, as he concluded at the time of posttrial motions, extended substantively and temporally beyond the appropriate scope of the MCAD's investigation.

iii. *The need for a new trial on liability and damages.* As we have detailed, the jury heard a significant amount of improperly admitted evidence of sexual harassment and hostile work environment. Of particular concern is the testimony concerning several incidents of offensive physical touching around or before 1994; as the judge remarked before trial, the "grabbing and touching" suggested a "sexually charged environment" different in kind from the allegations of the complaint, and there was no evidence at trial of similar incidents occurring within the

---

[33]If the plaintiff does not meet the continuing violation standard, the plaintiff may still use events that occurred prior to the six-month limitation period as background evidence of hostile work environment, but may not recover damages for time-barred events. *Cuddyer*, 434 Mass. at 530 n.10.

Cabral era. As a result, a new trial is required.[34] See *Middlesex Supply, Inc.* v. *Martin & Sons*, 354 Mass. 373, 375 (1968) ("Since this incompetent evidence may have influenced the jury, there must be a new trial"). See also *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. at 119, quoting *Slate* v. *Bethlehem Steel Corp.*, 400 Mass. 378, 384 (1987) (new trial necessary where the court "cannot ascertain on which theory the jury relied").[35]

The judge attempted to remedy the problem created by the admission of the extraneous evidence by ordering a remittitur. This was not a viable solution. Under Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), a new trial on damages may be allowed if it is conditioned on an order of remittitur, but the rule only comes into play when the issue in dispute is damages, not an issue relating to liability. Cf. *Lattimore* v. *Polaroid Corp.*, 99 F.3d at 468 (where jury verdict on liability and damages in discrimination case may have been affected by consideration of evidence on legal claims that should not have been submitted to them, new trial required). Cf. also *Freeman* v. *Wood*, 379 Mass. 777, 785 (1980) (additur process available as alternative to new trial only when, inter alia, "the verdict is sound except for inadequacy of the amount"); *VanAlstyne* v. *Whalen*, 20 Mass. App. Ct. 239, 241-242 (1985) ("In cases in which it cannot be said with certainty in which way a verdict resolved issues of liability or

---

[34]The town argues a new trial is required because the Superior Court lacked subject matter jurisdiction over aspects of the challenged claims in this case. In light of our conclusion that much of the challenged evidence was not properly admissible, we do not need to decide the question whether subject matter jurisdiction was lacking.

[35]The town would limit evidence at a new trial to interactions between Cabral and the plaintiff. As explained above, we disagree, and we conclude that the scope of the investigation rule permits the plaintiff to present at a new trial, in the words of her MCAD complaint, evidence of "[sexual] harassment and discriminatory terms and conditions of employment" as those terms and conditions manifested themselves during Cabral's tenure as supervisor. This evidence would include actions by Cabral and by McAuliffe, the existence of pornography at the department during Cabral's tenure, and conduct by other employees of the department during Cabral's tenure. Because references to pornography in the plaintiff's September, 2001, memorandum to MCAD were ambiguous as to time, we leave it to the judge on remand to determine whether evidence of pornography at the highway department prior to Cabral's promotion to foreman was also within the scope of investigation and therefore admissible.

causation . . . the proper practice is to order an unconditional new trial on all unresolved issues" rather than to grant additur).

b. *Motion for judgment n.o.v.* The town also argues that its motion for judgment n.o.v. was denied in error because, in the town's view, the evidence properly before the court did not support a finding of liability. We review the denial of the judgment n.o.v. motion by considering whether, "anywhere in the evidence, . . . any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. at 110 n.2, quoting *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 470 (1993).

The judge denied the town's motion because he concluded sufficient evidence was presented to the jury to sustain the plaintiff's case. We agree.

There was substantial evidence properly before the jury as to unlawful discrimination, hostile work environment, and constructive discharge within the time period that Cabral was the plaintiff's supervisor. Specifically, evidence was presented concerning Cabral's work assignments for the plaintiff and his statements to her that would permit the jury to find that Cabral's treatment of the plaintiff was discriminatory in that he assigned her jobs and equipment in a manner that was contrary to the general assignment policies that prevailed in the highway department and, inferably, on the basis of her gender. Cabral's "forbidden fruit" statement certainly could have been found to be sexually offensive, even though there was evidence suggesting a different meaning. The jury could have concluded that Cabral, as well as other, contemporaneous supervisors of the plaintiff, tolerated a working environment at the highway department that was saturated with pornography and sexual innuendo. The jury also could have found that McAuliffe, in his supervision of the grievance process, failed to remedy the situation and instead reinforced and contributed to a hostile environment.

Based on this evidence, the jury could have determined that during the period of Cabral's (and McAuliffe's) supervision of the plaintiff, she had been subject to a hostile work environment — an environment "pervaded by harassment or abuse" — and that the resulting "intimidation, humiliation, and stigmatization"

posed a "formidable barrier" to the plaintiff's full participation in the workplace. *Cuddyer*, 434 Mass. at 532, quoting *College-Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 162 (1987). They could have concluded as well that a reasonable person in the plaintiff's position would have left her job rather than remain in that environment, and further that the town caused and was therefore liable for the mental and emotional injuries about which the plaintiff and her doctor testified at trial.

Within the scope of evidence allowable at trial, the jury also could have concluded that the plaintiff's allegations amounted to a pattern of discrimination during the years that she was supervised by Cabral, anchored by events occurring within the six months before she filed her MCAD complaint, and therefore covered by the continuing violation doctrine. See *Cuddyer*, 434 Mass. at 541. For example, the jury could have found that the conduct of town officials around the time of the September 7, 2000, union grievance hearing amounted to an anchoring event, in that the town administrator adopted a hostile and repressive attitude toward the plaintiff's allegations of discriminatory misconduct. In addition, the jury could have decided that only after the plaintiff tried and failed to get her concerns addressed through the union grievance process did she conclude, reasonably, that her work environment was pervasively hostile and unlikely to improve. See *id.*

The town's motion for judgment n.o.v. was properly denied.

2. *The plaintiff's cross appeal: remittitur.* The plaintiff has appealed from the allowance of the town's motion for a new trial or in the alternative for remittitur. She argues that the full jury verdict should be reinstated on appeal on the ground that the jury verdict was justified by the evidence at trial, and that an election of remittitur is no longer binding where the opposing party has appealed. We have rejected the claim that the jury verdict was necessarily warranted by the properly admitted evidence. Moreover, because a new trial on both liability and damages is necessary in this case, we are not required to resolve the issue whether the plaintiff may revoke acceptance of remittitur on cross appeal after the defendant appeals from the judgment. See *Baudanza* v. *Comcast of Mass. I, Inc.*, 454 Mass.

622, 626 n.4 (2009) (noting but not deciding same issue). The parties, however, have briefed the revocation issue fully, it is one that may well arise in the future, and we choose to answer it. See *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943) (in light of public interest involved, although issue not properly presented for decision, court expressed opinion on fully argued issue).

A plaintiff presumably elects to accept remittitur in large part to end litigation and in that way to avoid the expense and ordeal of an appeal or a new trial. See *Lewis* v. *Wilson*, 151 U.S. 551, 555 (1894) ("A man may continue litigation and stand on his rights, or he may waive some of his rights for the sake of terminating litigation . . ."). The equitable purpose of remittitur would fail, however, if a plaintiff were to accept a reduced award to end litigation, fail to achieve that result because the defendant appeals from the subsequent judgment, but nonetheless remain bound by that choice. See *Baudanza*, 454 Mass. at 626 n.4. See also *Plesko* v. *Milwaukee*, 19 Wis. 2d 210, 220-221 (1963) (as matter of Wisconsin law, remittitur election binding only where opposing party does not appeal). But see *Fiacco* v. *Rensselaer*, 783 F.2d 319, 332-333 (2d Cir. 1986), cert. denied, 480 U.S. 922 (1987); *999* v. *C.I.T. Corp.*, 776 F.2d 866, 873 (9th Cir. 1985); *Higgins* v. *Smith Int'l, Inc.*, 716 F.2d 278, 282 (5th Cir. 1983). We therefore conclude that a party is not precluded from challenging on order of remittitur on cross appeal, provided the opposing party has appealed from the judgment first.[36]

3. *Conclusion.* The denial of the town's motion for judgment notwithstanding the verdict is affirmed, the allowance of the motion in the alternative for remittitur is reversed, the judgment of the Superior Court is vacated, and the case is remanded to the Superior Court for a new trial.

*So ordered.*

---

[36]The same rule would apply in a case where a party (usually a defendant) accepts an order for additur under rule 59 (a), but the opposing party then appeals from the judgment. We assume, however, that if the court on appeal denies a motion for a new trial and also denies the cross appeal of the remittitur or additur, the acceptance of the remittitur or additur would generally come back into force.